# IN THE MATTER OF THE ENFORCEMENT OF A SUBPOENA.

Suffolk. April 2, 2012. - August 9, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Judge. Commission on Judicial Conduct. Subpoena. Evidence,* Testimonial privilege. *Notice. Constitutional Law,* Privileges and immunities.

This court formally recognized a privilege that guards against intrusion into the deliberative processes of judges fundamental to ensuring that they may act without fear or favor in exercising their constitutional responsibility to be both impartial and independent, thereby furthering the finality of judgments, the quality and integrity of decision-making, and the independence and impartiality of the judiciary [166-173]; further, this court concluded that such a privilege is narrowly tailored but absolute, covering a judge's mental impressions and thought processes in reaching a judicial decision (whether harbored internally or memorialized in other nonpublic materials), as well as confidential communications among judges and between judges and court staff made in the course of and related to their deliberative processes in particular cases, but not covering a judge's memory of nondeliberative events in connection with cases in which the judge participated, inquiries into whether a judge was subjected to improper extraneous influences or ex parte communications during the deliberative process, or instances when a judge is witness to or was personally involved in a circumstance that later becomes the focus of a legal proceeding [174-175]; finally, this court concluded that recognition of such a privilege would not overly impede investigations by the Commission on Judicial Conduct [175-178].

This court remanded to the single justice a motion by a judge to quash or modify a subpoena issued by the Commission on Judicial Conduct to oversee the issuance of a revised subpoena that did not relate to the judge's internal thought processes and deliberative communications, memorialized in notes, diaries, or otherwise. [178]

This court concluded that notice to witnesses before the Commission on Judicial Conduct (commission), including a judge, is no greater than that afforded to witnesses in civil proceedings, and that a notice accompanying a subpoena from the commission that sought to compel a particular judge to testify was not unreasonable or oppressive, but was sufficient to permit the judge to prepare adequately for questioning. [178-180]

PETITION filed in the Supreme Judicial Court for the county of Suffolk on December 7, 2011.

The case was reported by *Spina,* J.

In the Matter of the Enforcement of a Subpoena.

*Michael B. Keating* (*David A. Kluft* & *Daniel L. McFadden* with him) for the petitioner.

*J. William Codinha* (*Gillian E. Pearson, Devon A. Haft,* & *D. Danielle Pelot* with him) for Commission on Judicial Conduct.

The following submitted briefs for amici curiae:

*J. Owen Todd, Michael Thad Allen,* & *Nancy Gertner* for Margaret A. Burnham & others.

*Gretchen S. Silver,* of New York, *Barry S. Pollack, Joshua L. Solomon, Phillip Rakhunov,* & *Peter B. Krupp* for Massachusetts Association of Criminal Defense Lawyers.

*Thomas J. Carey, Jr.,* & *Martin W. Healy* for Massachusetts Bar Association.

*Joseph D. Early, Jr.,* District Attorney for the Worcester District, *Michael O'Keefe,* District Attorney for the Cape & Islands District, *David F. Capeless,* District Attorney for the Berkshire District, *C. Samuel Sutter,* District Attorney for the Bristol District, *Jonathan W. Blodgett,* District Attorney for the Eastern District, *Mark G. Mastroianni,* District Attorney for the Western District, *Gerald T. Leone, Jr.,* District Attorney for the Middlesex District, *Michael W. Morrissey,* District Attorney for the Norfolk District, *David E. Sullivan,* District Attorney for the Northwestern District, *Timothy J. Cruz,* District Attorney for the Plymouth District, & *Daniel F. Conley,* District Attorney for the Suffolk District, for Massachusetts District Attorneys Association.

CORDY, J. In this case we conclude that although holding judges accountable for acts of bias in contravention of the Code of Judicial Conduct is essential, it must be accomplished without violating the protection afforded the deliberative processes of judges fundamental to ensuring that they may act without fear or favor in exercising their constitutional responsibility to be both impartial and independent. In so concluding, we formally recognize a judicial deliberative privilege that guards against intrusions into such processes — a protection we have implicitly understood as necessary to the finality, integrity, and quality of judicial decisions. Such a privilege is deeply rooted in our common-law and constitutional jurisprudence and in the precedents

of the United States Supreme Court and the courts of our sister States.[1]

*Background.* In December, 2010, a district attorney filed a complaint with the Commission on Judicial Conduct (commission), alleging that the petitioner, a judge, had repeatedly exhibited "disregard for the law, lack of impartiality, and bias against the Commonwealth," in violation of the Code of Judicial Conduct, S.J.C. Rule 3:09, as appearing in 440 Mass. 1301 (2003). The complaint enumerated twenty-four categories of decisions in which the judge allegedly exercised this bias. For each category, the complaint provided one or more illustrative examples from 1993 to 2009, with descriptions ranging from one paragraph to several pages. The commission appointed a special counsel to investigate the complaint confidentially. See G. L. c. 211C, § 5 (1); Rule 6 (I) of the Rules of the Commission on Judicial Conduct, Mass. Ann. Laws Court Rules 1320 (LexisNexis 2011-2012).

In the spring of 2011, the Boston Globe published a lengthy front page article and an editorial reporting on the complaint and criticizing the judge's conduct in ten cases from 1999 to 2011. Four of these cases were not included in the district attorney's complaint.

On October 24, 2011, the special counsel sent the judge a letter requesting that he attend a deposition, as authorized by G. L. c. 211C, § 5 (4). The special counsel listed six subject areas of inquiry: alien warnings; bail and sentencing determinations; motions to suppress and pretrial proceedings, generally; jury-trial waivers and trial proceedings, generally; police testimony; and search warrants. He also stated his intention to inquire about the cases identified in the original complaint, those discussed in the Boston Globe articles, and thirty additional cases, dating from 1998 to 2011. The letter further called on the judge to produce a broad set of documents. These requests were

---

[1]We acknowledge the amicus briefs of former Federal and State Judges Margaret A. Burnham, Suzanne V. DelVecchio, Allan van Gestel, Mel L. Greenberg, Rudolph Kass, Patrick J. King, Nancy Gertner, Charles B. Swartwood, and J. Owen Todd; the Massachusetts Association of Criminal Defense Lawyers; the Massachusetts Bar Association; and the Massachusetts District Attorneys Association.

subsequently incorporated into a subpoena dated November 11, 2011.

The petitioner responded by filing a motion before the commission for a protective order to quash or modify the subpoena, arguing that the requests for documents were overbroad. He further claimed that the subpoena encroached on his confidential, deliberative communications. In response, the special counsel reduced the number of new cases from thirty to twenty-three, and identified into which area of inquiry each case fell. The special counsel also removed one of the categories of requested documents.

A revised subpoena and request for documents was issued on December 5, 2011. In its current form, the subpoena calls on the judge to produce seven categories of documents. The present petition is most directly concerned with the first category: "Any notes, notebooks, bench books, diaries, memoranda, recordation or other written recollections of any of the cases described in the Complaint, cited in our letter to you of October 24th, or described in the Boston Globe articles."

In response, the petitioner filed a motion for a protective order and a motion to quash or modify the subpoena before a single justice in the county court. He also contends that he cannot be compelled to testify about the twenty-three additional cases identified by special counsel because he has not been given adequate notice of the misconduct of which he is accused in those cases. The single justice reserved and reported the matter, without decision, to the full court.

*Statutory scheme.* We begin by briefly reviewing the mandate and investigatory powers of the commission. Established by St. 1978, c. 478, § 114, the commission has the "authority to receive information, investigate, conduct hearings, and make recommendations to the supreme judicial court concerning allegations of judicial misconduct." G. L. c. 211C, § 2 (1). The commission may recommend that a judge be disciplined for various categories of misconduct, including "any conduct that constitutes a violation of the code[] of judicial conduct," G. L. c. 211C, § 2 (5) (*e*), a code that, among other things, obligates a judge to "perform judicial duties without bias or prejudice." S.J.C. Rule 3.09, Canon 3 (B) (5), as appearing in 440 Mass. 1301 (2003).

Commission proceedings are not, however, "a substitute for an appeal," and "[i]n the absence of fraud, corrupt motive, bad faith, or clear indication that the judge's conduct violates the code of judicial conduct, the commission shall not take action against a judge for making findings of fact, reaching a legal conclusion, or applying the law as he understands it." G. L. c. 211C, § 2 (4).

On receiving a complaint stating facts that, if true, would be grounds for discipline, the commission must notify the judge and "conduct a prompt, discreet and confidential inquiry, investigation and evaluation." G. L. c. 211C, § 5 (1). The commission is vested with broad investigatory powers, including the ability "to compel by subpoena the attendance and testimony of witnesses, including the judge, and to provide for the inspection of documents, books, accounts, and other records." G. L. c. 211C, § 5 (4). This investigatory power is not, however, unlimited, and "[a] witness at any stage of commission proceedings may rely on any privilege applicable to civil proceedings." G. L. c. 211C, § 3 (5). If the subpoena seeks to invade a "privilege applicable to civil proceedings," the judge, as a witness, would be entitled to assert it.

The subpoena at issue here plainly and admittedly directs the judge to produce notes and other material concerning his decision-making in cases over which he presided. Special counsel concedes that he is "concerned with understanding [the judge's] processes, methodology, and conduct in adjudicating cases before him," and considers it necessary to delve into the judge's mental processes because of the "notoriously elusive" and "difficult" task of proving bias. Consequently, we must decide whether there exists a privilege that protects the deliberative process of judicial decision-making.

*Judicial deliberative privilege.* In general, no person has a privilege to refuse to be a witness, refuse to disclose any matter, refuse to produce a writing, or prevent another from doing the same. Mass. G. Evid. § 501 (2012). "Testimonial privileges are exceptions to the general duty imposed on all people to testify." *Commonwealth* v. *Corsetti,* 387 Mass. 1, 5 (1982). Thus, the recognition of privileges contravenes the "fundamental maxim that the public . . . has a right to every man's evidence." *United*

*States* v. *Bryan*, 339 U.S. 323, 331 (1950), quoting 8 J. Wigmore, Evidence § 2192, at 70 (3d ed. 1961). When we recognize testimonial privileges, a power "that we have exercised sparingly," *Babets* v. *Secretary of Human Servs.*, 403 Mass. 230, 234 (1988), we do so on the basis that "excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Three Juveniles* v. *Commonwealth*, 390 Mass. 357, 359-360 (1983), cert. denied, 465 U.S. 1068 (1984). Therefore, it is important to examine the purposes and interests furthered by the recognition of a judicial deliberative privilege that have formed the basis for its universal recognition by courts that have considered its application.

1. *Finality.* To ensure the finality of judgments, judges have long been barred from testifying to impeach their own verdicts. "A judgment is a solemn record. Parties have a right to rely upon it. It should not lightly be disturbed, and ought never to be overthrown or limited by the oral testimony of a judge or juror of what he had in mind at the time of the decision." *Fayerweather* v. *Ritch*, 195 U.S. 276, 307 (1904). We have more recently affirmed the underlying importance of this rule to the integrity and finality of decision-making. In *Glenn* v. *Aiken*, 409 Mass. 699 (1991), a trial attorney sought to defend against a claim of legal malpractice by introducing an affidavit prepared by the judge regarding his decision-making at a trial the attorney was alleged to have mishandled. Citing *Fayerweather* v. *Ritch, supra,* we held that "summoning judges to testify on such matters" was inappropriate and that "[p]robing the mental processes of a trial judge, that are not apparent on the record of the trial proceeding, is not permissible." *Glenn* v. *Aiken, supra* at 703-704. See *Day* v. *Crowley*, 341 Mass. 666, 670 (1961), quoting *Fayerweather* v. *Ritch, supra* (judgment is solemn record not to be overthrown or limited by what judge "had in mind" at time of decision). We agreed with the reasoning of the United States Court of Appeals for the Fifth Circuit that thought processes reconstructed years after the fact are unlikely to be accurate, and that "the finality and integrity of judgments would be threatened by a rule that enabled parties to attack a judgment by probing the mental processes of a judge." *Glenn* v. *Aiken,*

*supra* at 704 n.5, quoting *Washington* v. *Strickland*, 693 F.2d 1243, 1263 (5th Cir. 1982), rev'd on other grounds, 466 U.S. 668 (1984).

For similar reasons, when juries (rather than judges) are called on to find facts and apply the law, we prohibit the use of juror testimony to impeach the jury's verdict absent allegations of extraneous "disturbing influences." *Commonwealth* v. *Fidler*, 377 Mass. 192, 195-197 (1979). Even where there is an allegation of bias, a judge may not inquire into the jurors' "subjective thought process, such as their reasons for concluding that the defendant was guilty [or] the content of their deliberations." *Commonwealth* v. *McCowen*, 458 Mass. 461, 494 n.35 (2010). The rule against juror testimony protects jurors from harassment, reduces incentives for jury tampering, promotes the finality of verdicts, maintains confidence in jury verdicts, *Commonwealth* v. *Fidler*, *supra* at 195, and has deep roots in our common law. See *Murdock* v. *Sumner*, 22 Pick. 156, 157 (1839) (verdict must be "best evidence of their belief, both as to the fact and the law," and juror affidavits "will not be received to prove any mistake of the evidence or misapprehension of the law"); *Hannum* v. *Belchertown*, 19 Pick. 311, 313 (1837) (secrecy of jury deliberation and discussion and exemption from questioning of their motives and grounds of action "are highly important to the freedom and independence of their decisions").

2. *Quality and integrity of decision-making*. In addition to ensuring the finality of judgments, protecting judges from the post hoc probing of their mental processes also ensures the integrity and quality of judicial decision-making. Federal and State courts faced with requests to question judges or their law clerks regarding judicial deliberations have underscored the importance of protecting that process, not just for the sake of the judge's personal interests, but to ensure the quality and integrity of decision-making that benefits from the free and honest development of a judge's own thinking and candid communications among judges and between judges and the courts' staff in resolving cases before them. See *State ex rel. Kaufman* v. *Zakaib*, 207 W. Va. 662, 672 n.11 (2000) (shielding judges protects public more than judge because "judges could not do their jobs if their internal thought processes were subject to

examination"). "If the rule were otherwise, the advice that judges receive and their exchange of views may not be as open and honest as the public good requires. . . . In order to protect the effectiveness of the judicial decision-making process, judges cannot be burdened with a suspicion that their deliberations and communications might be made public at a later date." *Thomas v. Page*, 361 Ill. App. 3d 484, 490 (2005). See *Matter of Certain Complaints Under Investigation by an Investigating Comm. of the Judicial Counsel of the Eleventh Circuit*, 783 F.2d 1488, 1519-1520 (11th Cir.), cert. denied, 477 U.S. 904 (1986) (*Williams*) ("Judges . . . depend upon open and candid discourse with their colleagues and staff to promote the effective discharge of their duties").

This court has also censured attorneys who attempted to "pierce the confidential communications of a former law clerk and a judge in a pending matter to benefit one of the litigants." *Matter of Curry*, 450 Mass. 503, 526 (2008). We deemed such attempts to be "prejudicial to the administration of justice," which requires "respect for the internal deliberations and processes that form the basis of judicial decisions, at very least while the matter is still pending." *Id.* Confidentiality in the inner workings of the court is appropriate "in order to foster frank and open discussions between judges and clerks, which promote more effective decision-making." *Matter of Crossen*, 450 Mass. 533, 560 (2008).

3. *Independence and impartiality.* The judiciary's independence from the other branches of government and from outside influences and extraneous concerns has been one of the cornerstones of our constitutional democracy, intended to ensure that judges will be free to decide cases on the law and the facts as their best judgment dictates, without fear or favor.

The writings of John Adams preceding the drafting and adoption of the Massachusetts Constitution developed and articulated the essential linkage between judicial independence and impartial decision-making:

> "[Judges'] minds should not be distracted with jarring interests; they should not be dependent upon any man, or body of men. To these ends, they should hold estates for

> life in their offices; or, in other words, their commissions should be during good behavior, and their salaries ascertained and established by law."

Thoughts on Government (1776), in 4 Works of John Adams 198 (C.F. Adams ed. 1851). In 1780, the right to be judged by an independent and impartial tribunal was incorporated into the Massachusetts Declaration of Rights:[2]

> "It is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit. It is, therefore, not only the best policy, but for the security of the right of the people, and of every citizen, that the judges of the supreme judicial court should hold their offices as long as they behave themselves well; and that they should have honorable salaries ascertained and established by standing laws."

Art. 29 of the Massachusetts Declaration of Rights.[3]

Accordingly, "[t]he great responsibility of a judge is to exercise his best judgment in applying his interpretation of the law to the facts. No judge should ever be concerned with whether his decision will be popular or unpopular. He does his job always with complete awareness that political considerations of the day, contemporary public emotions (no matter what their motivation), and personal philosophies are completely foreign and irrelevant to the exercise of his judicial power." *Commonwealth v. O'Neal*, 369 Mass. 242, 273 (1975) (Tauro, C.J., concurring).

---

[2]One hundred and sixty-eight years later, in 1948, the United Nations declared the right to be tried "by an independent and impartial tribunal" to be a fundamental human right. See Universal Declaration of Human Rights, G.A. Res. 217 (111) A, U.N. Doc. A/RES/217(111) (Dec. 10, 1948).

[3]Our State Constitution also does not permit "interference by . . . [one] department with the power of . . . [another] department." *Opinion of the Justices*, 365 Mass. 639, 642 (1974), quoting *Opinion of the Justices*, 208 Mass. 610, 613 (1911). See art. 30 of the Massachusetts Declaration of Rights (separation of powers). The circumstances of this case raise these very concerns. Although the Commission on Judicial Conduct (commission) is formally a judicial body, the complaint against the judge was initiated by an executive branch official.

"Independence means freedom from every form of compulsion or pressure. . . . The moment a decision is controlled or affected by the opinions of others or by any form of external influence or pressure, that moment the judge ceases to exist." H.T. Lummus, The Trial Judge 9-10 (1937).

Consistent with the imperative of the Massachusetts Constitution that judges act free from outside or distracting influences or apprehensions on matters that come before them, we long ago adopted the principle of judicial immunity, deeming it to have "a deep root in the common law," *Pratt* v. *Gardner*, 2 Cush. 63, 70 (1848), quoting *Yates* v. *Lansing*, 5 Johns. 282, 2901 (N.Y. 1810), and to be "too well settled to require discussion." *Pratt* v. *Gardner*, *supra*. As Chief Justice Shaw explained, immunity is essential to impartial decision-making and to engendering public trust in the judiciary:

> "It is a principle lying at the foundation of all well ordered jurisprudence, that every judge, whether of a higher or lower court, exercising the jurisdiction vested in him by law, and deciding upon the rights of others, should act upon his own free, unbiassed convictions, uninfluenced by any apprehension of consequences. . . . *He is not bound, at the peril of an action for damages, or of a personal controversy, to decide right, in matter either of law or of fact; but to decide according to his own convictions of right, of which his recorded judgment is the best, and must be taken to be conclusive, evidence.* Such, of necessity, is the nature of the trust assumed by all on whom judicial power, in greater or lesser measure, is conferred. This trust is fulfilled when he honestly decides according to the conclusions of his own mind in a given case, although there may be great conflict of evidence, great doubts of the law, and when another mind might honestly come to a different conclusion." (Emphasis added.)

*Id.* at 68-69. The principle of judicial immunity has been repeatedly confirmed and expanded. See, e.g., *Commonwealth* v. *O'Neil*, 418 Mass. 760, 766-767 (1994); *Allard* v. *Estes*, 292 Mass. 187, 189-190 (1935), and cases cited; *Comins* v. *Sharkansky*, 38 Mass. App. Ct. 37, 39 (1995).

Equally important to ensuring judicial independence and the

free and impartial judging of disputes among parties regardless of how powerful or powerless they might be (or how popular or unpopular their causes) is the protection of a judge's deliberative process. See *Williams, supra* at 1517-1520 (confidentiality protects judge's independent reasoning from improper outside influences).

The application of impartial and independent judgment to matters in dispute is particularly important in realms of decision-making left principally to a judge's "discretion." These encompass many of the day-to-day decisions judges are called on to make. Appellate courts afford significant deference to judges in their review of such decisions, examining them only to ascertain whether any conscientious judge acting intelligently could honestly have concluded the same. See, e.g., *Twin Fires Inv., LLC* v. *Morgan Stanley Dean Witter & Co.*, 445 Mass. 411, 424-425 (2005).[4] The threat that any of the many such decisions a judge must make — very frequently unpopular with one party or another — might lead to a requirement that the judge detail his internal thought processes weeks, months, or years after the fact would amount to an enormous looming burden that could not help but serve as an "external influence or pressure," inconsistent with the value we have placed on conscientious, intelligent, and independent decision-making. Even the most steadfast jurist would be led to consider picking his or her way through some of the decisions of the day by way of a route less likely to disturb the interests of those with the greatest ability to bring about such an intrusive examination.[5]

4. *Recognition of privilege.* As the foregoing makes clear, the

---

[4]We anticipate that judges will be appointed based on, among other qualities, their intelligence, integrity, work ethic, and the depth and breadth of their personal and professional histories. See, e.g., E.F. Hennessey, Excellent Judges 5-28 (1997). We aspire to a judiciary that draws on and reflects the diverse experience of our population. We expect that those who are selected to be judges will act with both courage and compassion, and will bring sound judgment, forged from their own diverse experience, to their decision-making. Consequently, although judges must put their personal and political views aside when applying the law, it is not at all unexpected that different judges might come to different conclusions about, for example, the credibility of or weight to afford the testimony of certain witnesses at an evidentiary hearing, whether the probative value of evidence outweighs its prejudicial effect in a particular case, what conditions of release will best assure the appearance of someone released on bail, or the merits of one form of sentencing disposition over another.

[5]While theoretically any disgruntled litigant could bring a misconduct

need to protect judicial deliberations has been implicit in our view of the nature of the judicial enterprise since the founding. Consequently, we join other courts, State and Federal, that, when faced with attempts by third parties to extract from judges their deliberative thought processes, have uniformly recognized a judicial deliberative privilege. See *Williams, supra*; *Thomas* v. *Page*, 361 Ill. App. 3d 484, 491 (2005); *In re Cohen's Estate*, 105 Misc. 724, 725-726 (N.Y. Sur. 1919); *Leber* v. *Stretton*, 928 A.2d 262, 270 (Pa. Super. 2007); *State ex rel. Kaufman* v. *Zakaib*, 207 W. Va. 662, 670 (2000). See also *United States* v. *Morgan*, 313 U.S. 409, 422 (1941) (mental processes of judge cannot be subjected to scrutiny; "[s]uch an examination of a judge would be destructive of judicial responsibility"); *Grant* v. *Shalala*, 989 F.2d 1332, 1344 (3d Cir. 1993) (noting threat to administrative law judges and serious interference with ability to decide cases solely on evidence and law if thought process subject to subsequent inquiry; "[i]t has long been recognized that attempts to probe the thought and decision making processes of judges . . . are generally improper"); *Nixon* v. *Sirica*, 487 F.2d 700, 740-742 (D.C. Cir. 1973) (MacKinnon, J., concurring) (source of judicial privilege "rooted in history and gains added force from the constitutional separation of powers").

To the extent that "[e]xpress authorities sustaining [a judicial privilege] are minimal," it is "undoubtedly because its existence and validity has been so universally recognized." *Id.* at 740. See Sorenson, Jr., Are Law Clerks Fair Game? Invading Judicial Confidentiality, 43 Val. U. L. Rev. 1, 66-67 (2008) ("The relatively small amount of attention to the privilege in case law and secondary sources should not be attributed to the novelty or tenuousness of the privilege"); Catz, Judicial Privilege, 22 Ga. L. Rev. 89, 115 (1987) ("In two hundred years, few have discussed the [judicial] privilege and none have challenged it"). Special counsel has not cited, nor have we been able to locate, a single case rejecting the existence of a privilege for a judge's mental processes or intra-court deliberative communications.

---

complaint against a judge, we note the concern that this risk is greater in the case of a district attorney, whose office is generally involved in all criminal prosecutions before a given court and is thus uniquely able to exert the pressure that may arise from the probing of deliberative materials.

*Scope of judicial privilege.* Having established that a judicial deliberative privilege exists and, consequently, that it applies to commission proceedings, see G. L. c. 211C, § 3 (5), we turn to defining the privilege's scope. If the privilege is absolute, "the opposing party cannot defeat the privilege by an ad hoc, case-specific showing of need for the privileged information." *Thomas* v. *Page, supra* at 493, quoting E.J. Imwinkelried, The New Wigmore: A Treatise on Evidence § 3.2.4, at 139-140 (2002). A qualified privilege, on the other hand, does not prevent disclosure in every instance. "[T]he investigating party can attempt to show the importance of the inquiry for which the privileged information is sought; the relevance of that information to its inquiry; and the difficulty of obtaining the desired information through alternative means. The court then must weigh the investigating party's demonstrated need for the information against the degree of intrusion upon the confidentiality of privileged communications necessary to satisfy that need." *Williams, supra* at 1522. If a sufficient showing of need is made, the qualified privilege can be overcome even if the information sought falls within its scope.

In light of the important interests served by the recognition of a judicial deliberative privilege, as discussed, *supra*, we agree with the Illinois Appeals Court and the West Virginia Supreme Court that the best approach is to consider this privilege narrowly tailored but absolute. See *Thomas* v. *Page, supra* at 493-494; *State ex rel. Kaufman* v. *Zakaib, supra* at 670. This absolute privilege covers a judge's mental impressions and thought processes in reaching a judicial decision, whether harbored internally or memorialized in other nonpublic materials. The privilege also protects confidential communications among judges and between judges and court staff made in the course of and related to their deliberative processes in particular cases. *Thomas* v. *Page, supra* at 491-492.

It does not cover a judge's memory of nondeliberative events in connection with cases in which the judge participated.[6] Nor does the privilege apply to inquiries into whether a judge was

---

[6]Nor does the absolute privilege protect a judge from repeating what was said on the record as to the reason for his or her decision. In this connection, we emphasize that we encourage judges "to explain the basis for their decisions on the record. . . . By helping litigants to understand the basis for decisions in

subjected to improper "extraneous influences" or ex parte communications during the deliberative process. By definition, such influences and communications lie outside the protected sphere of the judge's internal deliberations. As in jury deliberations, inquiry into extraneous influences does not probe into "subjective mental processes," and "[t]he existence of such influences often can be objectively ascertained, and many times the evidence can be corroborated." *Commonwealth* v. *Fidler*, 377 Mass. 192, 198 (1979).

In addition, the privilege does not apply when a judge is a witness to or was personally involved in a circumstance that later becomes the focus of a legal proceeding. These cases concerning "acts that simply happen to have been done by judges" do not implicate a judge's deliberative processes during the course of his official duties. *State ex rel Kaufman* v. *Zakaib*, 207 W. Va. 662, 671 (2000). *Leber* v. *Stretton*, 928 A.2d 262, 270 n.12 (Pa. Super. 2007).[7]

*Judicial investigations.* "[J]udges who do not abide by those

cases, the judge also promotes public understanding of judicial proceedings." S.J.C. Rule 3:09, Commentary to Canon 3 (B) (9), as appearing in 455 Mass. 1301 (2009).

A judge may also, in exercise of his or her sound discretion, issue a timely explanatory memorandum that provides or supplements the reasons in support of an earlier order. S.J.C. Rule 3:09, Appendix A to Canon 3 (B) (9), as appearing in 455 Mass. 1304 (2009). Among the factors the judge must weigh before issuing such a memorandum are "the importance of avoiding or alleviating the parties' or the public's misunderstanding or confusion by supplementing the record to reflect in more detail the reasons in support of the judge's earlier decision"; and "the danger that the issuance of an explanatory memorandum would suggest that judicial decisions are influenced by public opinion or criticism voiced by third parties, and would not promote confidence in the courts and in the independence and impartiality of judges." *Id.*

[7]In the present case, we are not required to decide whether the judicial deliberative privilege always may be waived by the judge. Although ordinarily a privilege can be waived by its holder, see Mass. G. Evid. § 523 (2012) (waiver of privilege), as we have noted, the judicial deliberative privilege serves to protect not just the judge individually but the decision-making process necessary to ensuring an independent and impartial judiciary. In any event, analogous to what an attorney is permitted to do when a client has sued him or her for breach of duty or malpractice, see *Commonwealth* v. *Brito*, 390 Mass. 112, 119 (1983), when the commission has put at issue the partiality of specific decisions made by a judge, the judge may testify or otherwise produce evidence regarding those decisions to the extent necessary to defend himself against the accusations. See *Darius* v. *Boston*, 433 Mass. 274, 283 (2001) ("at

high and well recognized standards of personal and judicial conduct to which they must be held cannot employ the argument of judicial independence as a shield when questionable practices on their part are challenged." *Matter of DeSaulnier (No. 4)*, 360 Mass. 787, 809 (1972). See *Matter of Troy*, 364 Mass. 15, 40-41 (1973). However, contrary to the special counsel's assertions, the recognition of a judicial deliberative privilege will not overly impede the commission's investigations. Indeed, in prior cases, the commission has never needed to use information falling within the scope of this privilege to conduct its proceedings.

Judicial misconduct investigations have been pursued successfully, not by examining the judge's thought processes, but rather by identifying the judge's outward expressions of partiality or by examining the judge's conduct over time through which that partiality or other abuse has become apparent. See *Matter of Markey*, 427 Mass. 797, 800-808 (1998) (judge sanctioned for ex parte communications and repeated pattern of "wilful disregard" of law in conducting plea colloquies); *Matter of Brown*, 427 Mass. 146, 147, 154 (1998) (inappropriate comments from bench merited public reprimand); *Matter of King*, 409 Mass. 590, 601-602 (1991) (after bail hearing, judge remarked to assistant clerk that he set unusually high bail because of voting patterns of defendants' ethnic group); *Matter of Donohue*, 390 Mass. 514, 518, 522 (1983) (public censure for six separate acts that showed pattern of "wilful disregard of the law and not mere error of law"); *Matter of Scott*, 377 Mass. 364, 366-367, 370-382 (1979) (cataloging twenty-nine instances in which judge disregarded law, abused contempt power, imposed improper bail conditions, or failed to treat criminal or juvenile defendants and their lawyers with respect and courtesy); *Matter of Troy*, *supra* at 26-41 (listing seventeen instances in which judge deprived criminal defendants of constitutional or statutory rights relating to arraignment, assignment of counsel, or setting of bail). Cf. *Pratt* v. *Gardner*, 2 Cush. 63, 69-70 (1848) (best and conclusive evidence of judge's own convictions is his "recorded judgment"). See Miller, Bad Judges, 83 Tex. L. Rev.

issue" waiver not blanket waiver of privilege, but "limited waiver of the privilege with respect to what has been put 'at issue' ").

431, 445-447 (2004) (collecting cases in which judges were disciplined for bias based on statements in public record).

There are multiple sources of primary information, available to the public and the commission, on the basis of which judicial conduct and outward expressions of potential partiality can be assessed. Accessing these sources does not require intrusions into the deliberative processes of judges.

As a general matter, Massachusetts court proceedings (with exceptions involving juveniles) are fully open to the public and the media. Indeed, there is virtually no limit on what the media can report about such proceedings and the decision-making of judges, including reporting that is highly critical of both. See *Cowley* v. *Pulsifer,* 137 Mass. 392, 394 (1884) (Holmes, J.) ("It is desirable that [judicial proceedings] should take place under the public eye . . . because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed"). See also *Commonwealth* v. *Barnes,* 461 Mass. 644, 650 (2012), and cases cited. Similarly, court records, including the recorded and transcribed record of court proceedings, are also open to public inspection.[8] See *New England Internet Café, LLC* v. *Clerk of the Superior Court for Criminal Business in Suffolk County,* 462 Mass. 76, 82-83 (2012); *Republican Co.* v. *Appeals Court,* 442 Mass. 218, 222-223 (2004); *Boston Herald, Inc.* v. *Sharpe,* 432 Mass. 593, 605-608 (2000). The commission can access all court records and recorded proceedings, even those, such as juvenile proceedings, that might not be broadly available to the public.

In addition, the merits of decisions and other actions of judges are fully reviewable in the appellate process for consistency with the law. It can hardly be contested that the repeated and intentional failure to follow the plain requirements of the rules

---

[8]Exceptions to this principle of openness are limited and include the following: records of juvenile proceedings, highly personal information contained in court filings, and, at least temporarily, impounded filings regarding ongoing criminal investigations or including information that might impair a defendant's right to a fair trial. See *New England Internet Café, LLC* v. *Clerk of the Superior Court for Criminal Business in Suffolk County,* 462 Mass. 76, 83-84 (2012).

and regulations of the Commonwealth, or the rulings of this court, is a proper subject of judicial investigation and discipline. See S.J.C. Rule 3:09, Canon 3 (B) (2) ("A judge shall be faithful to the law"); *Matter of Donohue, supra* at 518 (distinguishing error of law from "wilful disregard of the law"). Errors and abuses of discretion are identified and corrected in published appellate decisions readily available to the bar, the public, and the commission.[9]

*Application.* In the present case, so much of the subpoena as relates to the judge's internal thought processes and deliberative communications, memorialized in notes, diaries, or otherwise, must be quashed. The remaining portions of the subpoena are not objectionable. Neither party has suggested the text of a revised subpoena that does not intrude on the judicial privilege we have recognized. We remand the matter to the single justice to oversee the issuance of a revised subpoena in the first instance.

*Notice.* We next turn to the judge's claim that he may not be compelled to testify about the twenty-three additional cases identified by the special counsel. The judge acknowledges that the commission may investigate his conduct in these additional cases. He argues, however, that before the commission may compel him to testify under oath, it is required to provide him with precise notice of the misconduct of which he is accused. We conclude that the notice afforded to witnesses before the

---

[9]In addition to the ordinary route of appeal in cases, our appellate system provides for prompt discretionary interlocutory appeals to correct errors or abuses as they may be occurring in the trial courts. This route is often used, for example, by the Commonwealth in criminal cases when it believes a judge's decision has wrongly compromised its ability to prosecute a case. See *Commonwealth* v. *Bell*, 442 Mass. 118, 122 (2004) (granting Commonwealth interlocutory relief regarding how judge should instruct jury, in spite of efforts of trial judge "to prevent the Commonwealth from seeking relief"); *Commonwealth* v. *DeJesus*, 440 Mass. 147, 151-153 (2003) (reinstating original sentence where trial judge improperly granted motion to revise sentence even though supporting affidavit was filed beyond sixty-day time frame); *Commonwealth* v. *Gonzalez*, 437 Mass. 276, 285 (2002), cert. denied, 538 U.S. 962 (2003) ("sham" proceeding put on by judge was insufficient to trigger jeopardy); *Commonwealth* v. *Bing Sial Liang*, 434 Mass. 131, 140 (2001) (judge's order requiring disclosure of victim-witness advocate notes vacated); *Commonwealth* v. *Taylor*, 428 Mass. 623, 630 (1999) (in case charging violation of protective order, trial judge not permitted to continue trial for one year to impede prosecution).

commission, including the judge, is no greater than that afforded to witnesses in civil proceedings, and that under this standard the notice accompanying the present subpoena is sufficient.

As the subject of investigation before the commission, a judge is entitled to notice at the earliest stages of an investigation and to challenge the adequacy of a complaint. Complaints before the commission must make "specific charges of misconduct to which the judge can reasonably make a response." *McKenney* v. *Commission on Judicial Conduct*, 377 Mass. 790, 801 (1979), *S.C.*, 380 Mass. 263 (1980) (*McKenney*). Under the current statutory scheme, the commission notifies the judge upon receipt of a complaint, but then investigates the complaint before receiving a formal response from the judge. G. L. c. 211C, § 5 (1)-(2).[10] If the commission determines that "there is adequate reason to proceed to the preparation of a detailed complaint or statement of allegations," the commission must serve the judge with this complaint or statement, and only then is the judge formally called on to respond. *Id.* at § 5 (5)-(7). Nevertheless, we have implicitly recognized the right of a judge to challenge the form and specificity of such a complaint even during the investigatory phase. See *Matter of the Enforcement of a Subpoena*, 436 Mass. 784, 787-788 (2002).

In the course of its investigation, the commission may identify and investigate additional allegations of misconduct. See *id.* at 787; *Matter of King*, 409 Mass. 590, 592-593 (1991). The new allegations need not be embodied in an additional complaint. *Id.* at 598 n.7. It is appropriate to inform the judge of such an expansion. See *Matter of the Enforcement of a Subpoena, supra* at 787-788 (judge was informed of expanded inquiry but did not object). In the present case, the judge accepts that both the notice initially provided by the commission and the expansion of the commission's investigation were proper.

The judge objects to the notice provided to him not in his capacity as a subject of investigation, but in his capacity as a

[10]The case of *McKenney* v. *Commission on Judicial Conduct*, 377 Mass. 790, 795 (1979), was decided under a prior version of G. L. c. 211C, which required a judge to respond to a complaint within thirty days, or waive his opportunity to respond, before the commission could commence an investigation.

witness. Neither the statute nor the commission's rules dictates the nature of the notice that the commission must afford a witness before it issues a subpoena or takes a deposition. See G. L. c. 211, § 5 (4); Rule 6 (P) of the Rules of the Commission on Judicial Conduct, Mass. Ann. Laws Court Rules 1321 (Lexis-Nexis 2011-2012). Cf. *Matter of the Enforcement of a Subpoena*, *supra* at 789 (witness lacks standing to assert judge's right of notice). In the absence of specific guidance, we import the standard applicable to civil actions. See G. L. c. 211C, §§ 3 (5), 7 (2), 7 (14) (applying rules of civil procedure to matters before commission). Under Mass. R. Civ. P. 45 (b), 365 Mass. 809 (1974), a court may quash or modify a subpoena if it is "unreasonable and oppressive." See *Hull Mun. Lighting Plant* v. *Massachusetts Mun. Wholesale Elec. Co.*, 414 Mass. 609, 616-617 (1993); *Finance Comm'n of Boston* v. *McGrath*, 343 Mass. 754, 765 (1962).

The portion of the subpoena relating to the twenty-three new cases is not so vague as to be unreasonable or oppressive. The commission has provided the judge with the name, date, and docket number of each of the new cases. The special counsel has also identified the subject area of inquiry with respect to each of the cases: jury trial waivers and trial proceedings; police testimony; motions to suppress and pretrial proceedings; bail and sentencing determinations; or "other allegations." Each of these areas of inquiry is further broken down into up to seven specific subcategories of alleged misconduct. A review of the dockets in concert with the misconduct allegations related to each subject area should make clear the particular allegation related to each of the new cases. Especially in light of our holding that the judge need not answer questions that are protected by a judicial deliberative privilege, we are satisfied that the judge will be able to prepare adequately for questioning on the basis of the notice provided.

*Conclusion.* The case is remanded to the single justice to oversee the issuance of a revised subpoena consistent with this opinion.

*So ordered.*