No. 105,982

STATE OF KANSAS, *Appellee*, v. JOSEPH M. BUSER, *Appellant*.

ORDER

This is a criminal appeal in which the defendant is represented by Meryl Carver-Allmond, an attorney in the Capital Appellate Defender's Office. This particular matter comes before the court on her Motion to Find Mandatory Application of K.S.A. 2014 Supp. 20-3301 Unconstitutional. The State filed no response to the motion.

Generally speaking, K.S.A. 2014 Supp. 20-3301 imposes deadlines for all state court decisions. In the context of this case, the statute's first step is to direct all counsel after those deadlines have run to submit a joint request to the Supreme Court that a decision be entered "without further delay." See K.S.A. 2014 Supp. 20-3301(c)(2). We recognize and echo the statute's spirit, which aims to promote prompt judicial decisions. But, for the reasons explained below, we hold that section (c) violates the separation of powers doctrine embedded in the Kansas Constitution and is unconstitutional. Accordingly, we grant Carver-Allmond's motion and relieve her of any purported duty to comply with its provision.

SEPARATION OF POWERS AND STANDARD OF REVIEW

We have long-recognized that the doctrine of separation of powers is inherent in the structure of the people's constitution. See *Coleman v. Newby*, 7 Kan. 82, 87, 1871 WL 696 (1871) (Kansas Constitution creates three "distinct and separate" branches of government); *State ex rel. Anderson v. Shanahan*, 183 Kan. 464, 469, 327 P.2d 1042 (1958) ("our constitution is the fundamental law of the people.") (citing *Prohibitory-Amendment Cases*, 24 Kan. 700, 707, 1881 WL 748 [1881]). The doctrine generally means that " 'the legislature makes, the executive executes, and the judiciary construes the law.' " *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 883, 179 P.3d 366 (2008) (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat) 1, 46, 6 L. Ed. 253 [1825]).

Whether a statute is unconstitutional because it violates the separation of powers doctrine is for this court to determine. Because, as we reaffirmed just last year, " 'the final decision as to the constitutionality of legislation rests exclusively with the courts . . . [t]he judiciary's sworn duty includes judicial review of legislation for constitutional infirmity.' [Citation omitted.]" *Gannon v. State,* 298 Kan. 1107, 1159, 319 P.3d 1196 (2014); *State ex rel. Slusher v. City of Leavenworth,* 285 Kan. 438, 452-53, 172 P.3d 1154 (2007) (declaring veteran's preference statute constitutional); *Petersilie v. McLachlin,* 80 Kan. 176, 180, 101 P. 1014 (1909) (holding unconstitutional a legislative declaration of the truth of facts because an invasion of the province of the judicial branch); *Auditor of State v. A.T.&S.F. Railroad Co.,* 6 Kan. 500, 506, 1870 WL 507 (1870) (" 'It is emphatically the province and duty of the judicial department to say what the law is.' ") (quoting *Marbury v. Madison,* 5 U.S. [1 Cranch] 137, 177, 2 L. Ed. 60 [1803]).

## ANALYSIS

K.S.A. 2014 Supp. 20-3301 became effective on July 1, 2014. The statute imposes deadlines for all Kansas state courts to issue decisions on all motions, bench trials, and appeals. Relevant to the pending motion, subsection (c) provides:

"(1) The supreme court shall render and file its decision on motions and appeals within 180 days after the matter is submitted for decision.

"(2) If the supreme court does not enter and file its decision on a submitted matter within 180 days of submission, all counsel shall, within 190 days after the matter is submitted for decision, file with the court a joint request that such decision be entered without further delay. A copy of such request shall be sent to the chief justice and made available to the public.

"(3) Within 30 days after the filing of a joint request, the supreme court shall enter its decision or advise the parties in writing of the date by which the decision will be entered. A copy of such written advice shall be filed in the case, sent to the chief justice and made available to the public.

"(4) In the event the supreme court fails to enter its decision or to advise the parties of an intended decision date as required by subsection (c)(3), all counsel shall then file a joint request with the chief justice to establish an intended decision date. A copy of such request shall be filed in the case and made available to the public.

"(5) Upon receipt of a request under subsection (c)(4), the chief justice shall, after consultation with the justice or justices to whom the matter is assigned, establish a firm intended decision date by which the court's decision shall be made. Such setting of a final intended decision date shall be in writing, filed in the case, served on the parties and made available to the public."

Buser's appeal challenges whether the 2011 amendments to the Kansas Offender Registration Act, K.S.A. 22-4901 *et seq.*, can be applied retroactively to his 2009 conviction without violating the Ex Post Facto Clause of the United States Constitution. See U.S. Const. art. 1, § 9. His case is among a trio heard the same day containing the same or a related federal ex post facto issue. Our lower courts are divided on the question. See *State v. Buser*, No. 105,982, 2013 WL 1149655, at *6-7 (Kan. App. 2013) (unpublished opinion) (retroactive application permissible); *State v. Redmond*, No. 12-CR-2222 (Kan. 3d Jud. Dist. Ct. Aug. 20, 2013) (registration act violates Ex Post Facto Clause); *Doe v. Thompson*, No. 12-C-168 (Kan. 3d Jud. Dist. Ct. Jul. 15, 2013) (registration act violates Ex Post Facto Clause).

After more than 180 days had passed since this court took Buser's case under advisement following oral argument, Carver-Allmond filed the present motion. She contends we should relieve her of the statute's express duty to file the "joint request that such decision be entered without further delay" under subsection (c)(2) because that provision violates the separation of powers doctrine. She relies on *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, particularly emphasizing that subsection (c)(2) imperils her ethical obligations as an attorney under Rule 3.1 of the Kansas Rules of Professional Conduct (KRPC) (2014 Kan. Ct. R. Annot. 602). Like Carver-Allmond, appellate counsel in other cases have resisted compliance with this statute.

In *Sebelius*, we addressed the Funeral Privacy Act. Its "judicial review" provision directed the Attorney General to file a lawsuit to obtain "judicial determination of the constitutionality" of the Act. 285 Kan. at 882. The "judicial trigger" provision stated that most of the Act would not be operative until it was judicially held to be constitutional. Instead of filing the suit, the Attorney General

brought an original quo warranto action in this court, alleging these provisions violated the separation of powers doctrine.

The Attorney General first contended the judicial review provision required him to file a lawsuit that sought an unconstitutional advisory opinion. Accordingly, he argued the legislature had impermissibly intruded into judicial and executive power by directing him to file a meritless, *i.e.*, unconstitutional, lawsuit in violation of his ethical obligation as an attorney. See KRPC 3.1 (meritorious claims and contentions). He argued this required the court to find a violation of the separation of powers doctrine. See *Sebelius*, 285 Kan. at 879.

We agreed with him that "[t]he separation of powers doctrine prohibits the legislature from directing the Attorney General to file a lawsuit that would seek an unconstitutional remedy." 285 Kan. at 879. And, because we also agreed that the remedy to be sought under the Act was indeed unconstitutional because it would seek an advisory opinion from the court, we held these statutes violated the separation of powers doctrine. 285 Kan. at 879.

Similarly, we agree with Carver-Allmond. Like the Funeral Privacy Act in *Sebelius*, K.S.A. 2014 Supp. 20-3301(c)(2) requires her to violate her ethical obligations under the KRPC by directing her to file for a remedy that violates the separation of powers doctrine.

*Carver-Allmond is an officer of the court.*

Carver-Allmond's argument first requires us to consider whether our rationale in *Sebelius* extends beyond the Attorney General—a constitutional officer under Kan. Const. art. 1, § 1. In *Sebelius*, we ruled, "the legislature . . . lacks constitutional authority to intrude into the attorney general's duties as an officer of the court," explaining "[t]he legislature cannot override *an attorney's* ethical duties" under KRPC 3.1. (Emphasis added.) 285 Kan. at 887.

Although not mentioned in *Sebelius*, we explicitly observe today that the rules cited there covering attorney ethics, *i.e.*, the KRPC, have been created by this court pursuant to its longstanding and exclusive jurisdiction over attorney conduct. See *Martin v. Davis*, 187 Kan. 473, 478-79, 357 P.2d 782 (1960) (included in the exercise of judicial power in the administration of justice is the inherent

right to define, supervise, regulate and control the practice of law "and this is so notwithstanding acts of the legislature in the exercise of its police power to protect the public interest and welfare"); *State v. Goodnow*, 12 Kan. App. 2d 294, 300, 740 P.2d 113 (1987) (Supreme Court has exclusive jurisdiction over attorney discipline). See also Rule 201 (2014 Kan. Ct. R. Annot. 301) ("Any attorney admitted to practice law in this state . . . is subject to the jurisdiction of the Supreme Court and the authority hereinafter established by these Rules").

In addition to pointing out the Attorney General was an officer of the court and therefore subject to the KRPC, in *Sebelius* our rationale emphasized he was "duty bound to uphold the constitution" per K.S.A. 54-106 (oath of office for elected officers to support the Kansas Constitution). 285 Kan. at 887. In the same vein, we observe that as a licensed Kansas attorney, Carver-Allmond also is duty bound to uphold the constitution because she took an oath—created, and required, by this court through its judicial power—to support it. See KRPC Rule 720 (2014 Kan. Ct. R. Annot. 850). See *Martin*, 187 Kan. at 479 (While attorneys "do not hold an office or public trust in a constitutional or statutory sense, they are, because of their close intimate relationship to the courts, an important part of the judicial system of the state and are 'officers of the court.' ").

In short, our conclusion in *Sebelius* about the legislature's lack of power to direct the Attorney General's actions was based on his obligation as an officer of the court, not simply a constitutional one conferred by his elected office. See also *State ex rel. Foster v. City of Kansas City*, 186 Kan. 190, 197, 350 P.2d 37 (1960) (Attorney General is officer of judicial branch; under separation of powers of three branches of government, was limited and restricted in his conduct before Supreme Court by the code of professional ethics to same extent any other lawyer would be). So our rationale in *Sebelius* applies to Carver-Allmond and all other counsel in pending cases.

*The two alternate, unconstitutional remedies*

As in *Sebelius*, we must still examine whether K.S.A. 2014 Supp. 20-3301(c)(2) directs Carver-Allmond to seek an actual unconstitutional remedy, *i.e.*, one that violates the separation of powers doctrine. That conclusion would mean a violation of her ethical duties, and she would have no duty to comply.

To place this question in context, we return to subsection (c)(1), which provides "the supreme court shall render and file its decision . . . within 180 days after the matter is submitted for decision." In turn, subsection (c)(2) provides that if the court misses this deadline, Carver-Allmond and her opposing counsel shall file with the court a joint request that we enter a decision in their case "without further delay." Subsection (c)(3) then fully describes the remedy sought by this joint request: Within 30 days, the Supreme Court either "shall enter its decision or advise the parties in writing of the day by which the decision will be entered." Supplying one of these remedies is "required" of the court by subsection (c)(4) (the alternative remedies "as required by subsection [c][3]").

In effect, subsection (c)(2) directs Carver-Allmond and opposing counsel to file a joint request triggering one of two mandated remedies from the court under subsection (c)(3): (1) the release of a decision no later than the legislature's deadline; or (2) the establishment of a solid deadline for the release of the opinion, *i.e.*, a status report required of the court to counsel about the pending appeal. So to decide the constitutionality of subsection (c) per *Sebelius*, we must proceed to determine whether both of these alternative remedies violate the separation of powers doctrine.

We begin by acknowledging that although each branch of government has its own powers,"[i]n reality, there is an overlap and blending of functions, resulting in complementary activity by the different branches that makes absolute separation of powers impossible." *Miller v. Johnson*, 295 Kan. 636, 671, 289 P.3d 1098 (2012). Given this reality, an unconstitutional "usurpation of powers exists [only] when one branch of government significantly interferes with the operations of another branch." 295 Kan. at 671.

To determine whether a significant interference has occurred, we consider: "(1) the essential nature of the power being exercised;

(2) the degree of control by one branch over another; (3) the objective sought to be attained; and (4) the practical result of blending powers as shown by actual experience over a period of time." 295 Kan. at 671 (citing *Sebelius*, 285 Kan. 884). We will apply these four *Miller* factors to each of the alternative remedies required of the court in K.S.A. 2014 Supp. 20-3301(c).

### 1. *The legislature's mandatory court-deadline remedy*

The first statutory remedy requires the court to enter its decision within 30 days of the filing of the joint request. In the view of Carver-Allmond, the virtue of a "sound" and "well-reasoned decision" for her client is therefore sacrificed for an "arbitrarily speedy" one.

We begin our application of the first *Miller* factor (essential nature of the power being exercised) by reviewing art. 3, § 1 of the Kansas Constitution. It provides "[t]he supreme court shall have general administrative authority over all courts in this state." The Wisconsin Supreme Court held that a similar constitutional provision granting it administrative authority over all state courts specifically included the power to set time limits for judicial decision-making. *Complaint Against Grady*, 118 Wis. 2d 762, 782, 348 N.W.2d 559 (1984). Under this rationale alone, the power in Kansas to set such decision-making time limits clearly belongs to the state supreme court.

This specific language in art. 3, § 1 is not the only basis for such a conclusion, however. We observe that § 1 generally grants the "judicial power" of the state exclusively to the courts. *Sebelius*, 285 Kan. at 895. Judicial power has been defined as the " 'power to hear, consider and determine controversies between rival litigants.' " 285 Kan. at 895 (quoting *State ex rel. Brewster v. Mohler*, 98 Kan. 465, 471, 158 P. 408 [1916]). This power was effectively at issue in *Coate v. Omholt*, 203 Mont. 488, 662 P.2d 591 (1983).

In the context of analyzing the separation of powers issue involved in a statute imposing decision deadlines on state judges, the *Coate* court addressed the nature of the judiciary's power to control the time frame for making those decisions. The court recognized: "With only one exception (*State ex rel. Emerald People's Util. v.*

*Joseph* (Ore. 1982), 292 Or. 357, 640 P.2d 1011), the Supreme Courts of those states called on to answer the question have declared that the essential nature of a constitutional court encompasses *the right to determine when a judicial decision will be made."* (Emphasis added.) 203 Mont. at 492.

The *Coate* court described that power as a " 'sphere[] of activity so fundamental and so necessary to a court, so inherent in its very nature as a court, that to divest [a court] of its absolute command within [this sphere] is to make meaningless the very phrase judicial power.' " 203 Mont. at 493-94 (quoting Levin & Amsterdam, *Legislative Control Over Judicial Rule-Making: A Problem in Constitutional Revision*, 107 U. Pa. L. Rev. 1, 29-30 [Nov. 1958]). See, *e.g., Sands v. Albert Pike Motor Hotel*, 245 Ark. 755, 760-62, 434 S.W. 2d 288 (1968) (striking down statute requiring trial court to affirm worker's compensation decision after on file 60 days; once case filed, becomes subject to constitutional jurisdiction of judiciary, "and its judicial course or final disposition is not subject to legislative determination"); *State ex rel. Kostas v. Johnson*, 224 Ind. 540, 549, 69 N.E.2d 592 (1946) (striking down statute forbidding lower court to hold issue under advisement for more than 60 days and which deprived court of jurisdiction if no decision within 90 days; court must be judge of "order in which it will dispose of cases and what period of time proper disposition shall require").

We agree with the Supreme Court of Montana, the decisions of numerous other courts it references, and those we have found in our own research. The power to determine when a court renders its decisions is essential to the basic judicial power " 'to hear, consider and determine controversies between rival litigants.' " *Sebelius*, 285 Kan. at 895. *Cf. Chicago, K. & W. R. Co. v. Harris*, 42 Kan. 223, 225, 21 P. 1071 (1889) (inherently, Supreme Court must have power to protect its own jurisdiction, process, proceedings, orders, and judgments).

As for the second *Miller* factor (degree of control by one branch over another), we observe that since the *Coate* decision in 1983, Oregon apparently remains the only jurisdiction not to conclude that uniform statutory deadlines for all judicial decisions constitute an unacceptable degree of legislative control over the judicial func-

tion. See *In re Allcat Claims Service, L.P.*, 356 S.W.3d 455, 489 (Tex. 2011) ("With one lonely exception [Oregon], every single high court has concluded it is an inherently judicial task to determine when to render a judicial decision, and the separation of powers bars legislatures from telling courts when to do so.") (Willett, J., concurring in part and dissenting in part).

One legal commentator has described the heart of the problem when a court has been required to make the best decision it could within a legislatively allotted time:

"Under the separation of powers principles . . . , such a decision should be reversed, because the court has permitted the time limit to interfere with its decision making processes in such a way as to increase the risk of an arbitrary decision." *Rush to Judgment: A Constitutional Analysis of Time Limits on Judicial Decisions,* 77 B.U. L. Rev. 761, 806 (Oct. 1997).

Overall, "[w]hen one of the other branches interferes with the processes through which the judiciary reaches its judgments, the legitimacy of those judgments suffers." 77 B.U. L. Rev. at 798.

We agree with such reasoning and our sister supreme courts. Directing attorneys to ultimately compel the Supreme Court to release its decision by a date calculated by the legislature's formula is an inordinate degree of legislative control over the judicial power. Such control again points toward holding that subsection (c) violates the separation of powers doctrine.

The third *Miller* factor (the objective sought by this mandatory court-deadline remedy) raises an issue related to the first two factors and points to the same conclusion. The legislature has directed attorneys to file their joint request requiring the court to release its decision within 30 days in an apparent attempt to expedite the judicial decision-making process. But echoing the *Coate* court holding that this action violates the separation of powers, a year later the Wisconsin Supreme Court stated:

"We do not question the legislature's wisdom in promoting the prompt disposition of judicial business, nor do the time periods for decision-making it has established seem unreasonable. However, a reasonable time for judicial decision-making can be established only by the supreme court." *Grady,* 118 Wis. 2d at 782.

So while this apparent legislative objective is worthwhile, requiring attorneys to compel the court to release its decision within 30 days per subsection (c)(2) and (c)(3) in furtherance of that objective violates the separation of powers doctrine. The legislature cannot enforce an obligation of the judiciary that it owes solely to the people. See *Schario v. State*, 105 Ohio St. 535, 538, 138 N.E. 63 (1922).

The fourth *Miller* factor is neutral on the constitutionality of this remedy because we have no experience with the practical result of this type of legislative provision.

Under the four *Miller* factors taken together, we reach the inescapable conclusion that the mandatory court-deadline remedy contained in K.S.A. 2014 Supp. 20-3301(c)(3) violates the separation of powers doctrine. This remedy is therefore unconstitutional. This conclusion alone, however, does not invalidate subsection (c). We must examine the statute's alternative remedy. So we now turn to the question of its constitutionality.

### 2. *The legislature's attorney-driven court deadline remedy*

The second remedy in the joint request requires this court itself to fix a solid deadline for releasing its decision. This is but one of several demands made on the court by the legislature.

As mentioned, subsection (c)(1) provides the court "shall" render and file its decision within 180 days. And subsection (c)(3) provides that within 30 days after the filing of the parties' joint request, the court "shall" enter its decision or "shall" advise the parties in writing of the date by which the decision "will" be entered. Supplying one of these remedies is "required" of the court by subsection (c)(4) (the alternative remedies "as required by subsection [c][3]"). Subsection (c)(3) further provides that a copy of the advice "shall" be filed, sent to the chief justice, and made available to the public.

And, in the event of a court failure to comply, subsection (c)(5) provides "the chief justice *shall*, after consultation with the justice or justices to whom the matter is assigned, establish a *firm* intended decision date by which the court's decision *shall* be made." (Emphasis added.) Moreover, it also provides the "setting of a *final*

intended decision date *shall* be in writing, filed in the case, served on the parties and made available to the public." (Emphasis added.)

We begin application of the first two *Miller* factors by considering how the *Coate* court addressed a similar situation. There, a statute provided that the Montana Supreme Court's decisions must be reached, or opinions written, within 90 days of submission. If not, a justice could obtain an additional 30 days to reach the decision or write the opinion by submitting an affidavit with the chief justice giving the case name and number and the reason for delay. The statute provided that the parties involved in the case must be given a copy of the affidavit.

To justify further delay a justice was required to establish good cause for it by filing another affidavit with the Supreme Court before the expiration of the 120th day after submission. A majority of the Supreme Court was then required to determine whether additional time should be given to reach the decision or to write the opinion. See 203 Mont. at 490.

Perhaps aware of the growing number of jurisdictions rejecting his position, the defendant state auditor seemingly conceded that time limits "within which judicial decisions must be made are properly questions to be decided by the judiciary." 203 Mont. at 497. But, among other things, he argued the Montana statutes—like K.S.A. 2014 Supp. 20-3301(c)—nevertheless were "constitutional because it is the judiciary *which will always be making the final decision on how much time should be allowed to reach a decision or to write an opinion.*" (Emphasis added.) 203 Mont. at 497.

The *Coate* court rejected this argument: "Defendant ignores, however, *several mandatory* aspects of the statutes, which we have already mentioned." (Emphasis added.) 203 Mont. at 497. It ultimately concluded "that the challenged statutes constitute a direct infringement on the *functional and constitutional integrity of the judiciary* as a separate branch of government, and therefore that the statutes violate the separation of powers clause . . . of our State Constitution." (Emphasis added.) 203 Mont. at 504.

The *Coate* court was again referencing *Legislative Control Over Judicial Rule-Making: A Problem in Constitutional Revision*, 107 U. Pa. L. Rev. 1, 31-32, which it had quoted earlier.

" 'What the holdings [of courts from various jurisdictions] do suggest is that there is . . . a realm of "proceedings which are so vital to the efficient functioning of a court as to be beyond legislative power." This is the area of *minimum functional integrity of the courts*, "what is essential to the existence, dignity and functions of the court as a constitutional tribunal and from the very fact that it is a court." Any statute which moves so far into this realm of judicial affairs as to dictate to a judge how he shall judge or how he shall comport himself in judging *or which seeks to surround the act of judging with hampering conditions clearly offends the constitutional scheme of the separation of powers and will be held invalid.' "* (Emphasis added.) 203 Mont. at 493.

Various courts have recognized, as these law review authors state, that "certain judicial functions require that the courts alone determine how those functions are to be exercised." 203 Mont. at 493. See also *In re Enforcement of Subpoena*, 463 Mass. 162, 171, 972 N.E.2d 1022 (2012) (judicial "independence means freedom from every form of compulsion or pressure . . . . The moment a decision is controlled or affected by . . . any form of external influence or pressure, that moment the judge ceases to exist."; external influence or pressure is inconsistent with the value placed on conscientious, intelligent, and independent decision-making).

The attorney-driven deadline remedy that Carver-Allmond complains she must seek under (c)(2) ultimately requires the Supreme Court to deliberate, decide, justify, write, and issue a judicial opinion by a date fixed by the court itself after pressure by the lawyers as involuntary agents of the legislature. At a minimum, this is a clear interference with the court's decision-making function. As one commentator has written in a comparable context:

"When . . . Congress uses its power over practice and procedure to interfere with *any part of a federal court's decisionmaking function*, it crosses the line that separates the legislative from the judicial, and the Constitution demands that the familiar promise of efficiency yield to the greater good of judicial independence." *Rush to Judgment: A Constitutional Analysis of Time Limits on Judicial Decisions*, 77 B.U. L. Rev. at 813.

Staying out of the court's decision-making process is crucial because the only power of a court "if such it may be called, is the power of judgment", *i.e.*, the final product of that decision making. *United States v. Butler*, 297 U.S. 1, 62-63, 56 S. Ct. 312, 80 L. Ed. 477 (1936).

These authorities lead us to conclude the first two *Miller* factors strongly suggest the attorney-driven court deadline remedy in subsection (c)(3) violates the separation of powers. And the legislative requirement in subsection (c)(3) to reduce the deadline to writing, to advise the parties, and to make it "available to the public" only adds to that external pressure and interference with judicial decision-making. See *Coate*, 203 Mont. at 490-91 (supplying justice's affidavit to the parties).

The third *Miller* factor—the objective sought by this second remedy in subsection (c)(3)—raises an issue related to the first two and points to the same conclusion. As with the mandatory court-deadline remedy, with this one the legislature apparently directed attorneys to ask for a firm deadline—the "date by which the decision will be entered"—in an effort to expedite this court's decision-making process in pending cases. But, as noted in that analysis, this worthy motive is insufficient to justify this intrusion. See 77 B.U. L. Rev. at 813 (constitution demands that the familiar promise of efficiency must yield to the greater good of judicial independence).

Finally, the fourth *Miller* factor does not affect our decision on this remedy because Kansas has no experience with the practical results of attorney-driven deadlines. But the fourth factor's neutrality is entirely insufficient to overcome the first three *Miller* factors as we have described. Accordingly, we conclude this remedy under K.S.A. 2014 Supp. 20-3301(c) is unconstitutional as a violation of the separation of powers doctrine.

This is not to say, however, that all judicial restrictions imposed by the legislature are unconstitutional. See, *e.g.*, Kan. Const. art. 3, § 3 (supreme court shall have "such appellate jurisdiction as may be provided by law"); K.S.A. 60-2014 Supp. 26-504 (eminent domain appeals to the supreme court "shall take precedence over other cases, except . . . other cases in which preference is granted by statute"); *In re N.A.C.*, 299 Kan. 1100, 1106, 329 P.3d 458 (2014) (expedited appeal of child in need of care case under K.S.A. 2012 Supp. 38-2273[d] ["Notwithstanding any other provision of law to the contrary, appeals under this section shall have priority over all other cases."]).

In summary, through K.S.A. 2014 Supp. 20-3301(c)(2), the legislature directs attorneys to seek expedited judicial decisions by filing a joint request that seeks one of two unconstitutional remedies under subsection (c)(3). En route to that conclusion, we necessarily have decided the legislature's mandatory court-deadline in subsection (c)(1) ("The supreme court shall render and file its decision . . . within 180 days after the matter is submitted for decision") is also unconstitutional. Subsections (c)(1), (2), and (3) violate the separation of powers doctrine under the rationale expressed in *Sebelius*, 285 Kan. 875.

Without these subsections, the remainder of subsection (c) is meaningless. Accordingly, we grant Carver-Allmond's motion and relieve her of any purported duty to comply with subsection (c)(2).

IT IS SO ORDERED this 1st day of July, 2015.

Lawton R. Nuss
Chief Justice

STEGALL, J., not participating.

MALONE, S.J., assigned.