# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2012-NMCA-104

Filing Date: July 26, 2012

Docket No. 30,795

STATE OF NEW MEXICO ex rel.
DEBORAH TOOMEY, an individual,

　　　Plaintiff-Appellant,

v.

CITY OF TRUTH OR CONSEQUENCES,
MARY PENNER, SIERRA COMMUNITY
COUNCIL, and JAY HOPKINS,

　　　Defendants-Appellees.

APPEAL FROM THE DISTRICT COURT OF SIERRA COUNTY
Matthew G. Reynolds, District Judge

Deborah Toomey
Albuquerque, NM

Pro Se Appellant

Jaime F. Rubin, City Attorney
Truth or Consequences, NM

for Appellee

Luebben Johnson & Barnhouse LLP
Randolph H. Barnhouse
Los Ranchos de Albuquerque, NM

for *Amicus Curiae* New Mexico Foundation for Open Government

New Mexico Municipal League, Inc.
Randall D. Van Vleck
Santa Fe, NM

Charles Rennick, LLC
Charles Rennick
Santa Fe, NM

for *Amicus Curiae* New Mexico Municipal League, Inc.

**OPINION**

**VANZI, Judge.**

**{1}**     Plaintiff Deborah Toomey appeals from the district court's ruling that she is not entitled to certain DVD recordings she requested under the Inspection of Public Records Act (IPRA), NMSA 1978, §§ 14-2-1 to -12 (1947, as amended through 2011). The district court found that the Sierra Community Council, Inc. (SCC), a non-profit corporation that operates a public access cable channel under contract with the City of Truth or Consequences (the City), was not acting on behalf of the City and, therefore, the requested records were not public records subject to IPRA. We reverse.

**BACKGROUND**

**{2}**     In 2007, the City enacted Ordinance No. 577 (Ordinance), in which the City granted Baja Broadband Operating Company, LLC (Baja) a franchise to operate a cable system within the City limits. Among other things, the Ordinance required Baja to provide the City with one channel for noncommercial Public, Educational, and Governmental (PEG) use. In turn, the City agreed to be responsible for management of the PEG channel and to adopt rules, regulations, and procedures for access channel use. In order to support the PEG channel, Baja provides the City an annual grant of $3 per subscriber to the cable network.

**{3}**     Approximately one year after the Ordinance was enacted, the City entered into a contract (operating agreement) with SCC, designating it the "cable access management organization" for the PEG channel. The City agreed to provide funding to SCC to support the PEG channel through the dedicated portion of the franchise fees as well as equipment and, if available, physical space. In exchange, SCC agreed to operate the channel for "public/community access programming purposes" and further agreed to produce any programming the City required for a public purpose at no cost to the City. The operating agreement identified SCC as an independent contractor and stated that no principal/agent or employer/employee relationship existed between SCC and the City.

**{4}**     Thereafter, the City entered into a lease agreement (lease) with SCC for the basement of the civic center. The lease provided that the premises would be occupied by the "Sierra Community Council Public Access Cable Project" for use as a public access television center at the cost of $1 per year. Jay Hopkins, one of the signatories on the lease, was identified as the SCC Public Access Cable Project Director. By at least early September 2009, Hopkins attended the City Commission's semi-monthly meetings. Using a video recorder

2

purchased by the City for SCC, Hopkins recorded the meetings and then downloaded the recordings onto the SCC computer for replay on the PEG channel. The recordings remained on the computer until the next meeting was ready to be downloaded at which time the recording of the previous meeting was deleted.

{5}     On November 2, 2009, Plaintiff submitted a public records request to the City Clerk (Clerk) seeking the recordings of three City Commission meetings and one city workshop on truck traffic that had been played on the PEG channel. Plaintiff provided four blank DVDs for the copies along with her request. The Clerk forwarded the request to Hopkins. Hopkins replied, "[W]e are unable to fulfill the request" and advised the Clerk that Plaintiff was told she could tape the meetings from the PEG channel herself. Plaintiff wrote a detailed letter to the Clerk concerning Hopkins' reply to her request. In response, the Clerk sent Plaintiff a letter stating that there was nothing in the operating agreement that required the City to maintain recordings of the meetings and that, "[t]herefore, there are no recordings of City Commission meetings kept by [SCC] or the City Clerk's Office. We are unable to fulfill your IPRA request."

{6}     Plaintiff filed a complaint against the City, the Clerk, SCC, and Hopkins, for production of public records, mandamus, damages, and for declaratory and injunctive relief pursuant to Section 14-2-12, IPRA's enforcement provision. The complaint alleged that SCC operated the PEG channel for the City under the City's control and discretion and, therefore, the recordings of the City meetings were public records. After a bench trial on the merits, the district court entered findings of fact and conclusions of law. The district court found that SCC was an independent contractor, not an agent of the City. The district court further found that, at the time of the request, one meeting was still on SCC's computer; however, it concluded that nothing in the operating agreement required SCC to create, maintain, or hold recordings of City meetings on behalf of the City. Therefore, the district court ruled that "[n]o public record was created by virtue of Hopkins recording City meetings and SCC cablecasting those meetings." This appeal followed.

**DISCUSSION**

{7}     At the outset, we note that Plaintiff is proceeding pro se, and the City is the only defendant that filed an answer brief. Although Plaintiff's briefing is not without its flaws, the City's brief in this case is bereft of any argument on the relevant issues, leaving us without a coherent understanding of its position on appeal. For example, the City's brief fails to discuss IPRA, it fails to provide any legal analysis, and it fails to provide supporting authority for many of its assertions. We are therefore particularly grateful to amici for their assistance in this case. The New Mexico Foundation for Open Government (FOG) filed an amicus brief in support of Plaintiff, and the New Mexico Municipal League, Inc. (NMML) filed a brief as amicus curiae in support of the City.

{8}     Plaintiff raises a number of issues on appeal. However, the dispositive question is whether SCC's recordings of the City meetings were made on behalf of the City so as to

3

constitute public records within the meaning of IPRA. We begin with the standard of review and then turn to the statute at issue. Lastly, we address whether Plaintiff is entitled to a remedy under IPRA.

**Standard of Review**

**{9}** Our review requires us to interpret provisions of IPRA. "The meaning of language used in a statute is a question of law that we review de novo." *Cox v. N.M. Dep't of Pub. Safety*, 2010-NMCA-096, ¶ 4, 148 N.M. 934, 242 P.3d 501 (internal quotation marks and citation omitted), *cert. quashed*, 2011-NMCERT-006, 150 N.M. 765, 266 P.3d 634. When reviewing a district court's decision, this Court must give deference to the district court's factual determinations, but we review its conclusions of law de novo. *Mem'l Med. Ctr., Inc. v. Tatsch Constr., Inc.*, 2000-NMSC-030, ¶ 20, 129 N.M. 677, 12 P.3d 431. Further, we construe IPRA in light of its purpose and interpret it "to mean what the Legislature intended it to mean, and to accomplish the ends sought to be accomplished by it." *San Juan Agric. Water Users Ass'n v. KNME-TV*, 2011-NMSC-011, ¶ 14, 150 N.M. 64, 257 P.3d 884 (internal quotation marks and citation omitted). "In discerning the Legislature's intent, we are aided by classic canons of statutory construction, and we look first to the plain language of the statute, giving the words their ordinary meaning, unless the Legislature indicates a different one was intended." *City of Albuquerque v. Montoya*, 2012-NMSC-007, ¶ 12, 274 P.3d 108 (alteration, internal quotation marks, and citation omitted).

**SCC Was Acting on Behalf of the City**

**{10}** As we have noted, the substantive issue in this case is whether a private actor that contracts with a governmental entity to perform a public function is subject to the provisions of IPRA. IPRA defines "public records" as

> all documents, papers, letters, books, maps, tapes, photographs, recordings and other materials, regardless of physical form or characteristics, that are used, created, received, maintained or held by *or on behalf of* any public body and relate to public business, whether or not the records are required by law to be created or maintained.

Section 14-2-6(F) (emphasis added). IPRA's broad language defining public records is clear that, absent an express exemption from disclosure, public agencies must produce all records, even those held by or created by a private entity "on behalf of" the public agency. The "on behalf of" language, however, is not defined, and the statute does not indicate whether every purportedly public document created or held by a private entity comes within the ambit of IPRA or whether there are any limitations to production of requested records. *See Merriam-Webster's Collegiate Dictionary* 103 (10th ed. 1996) (defining "on behalf of" as "in the interest of" or "as a representative of"). The Legislature has offered no guidance on the issue.

4

**{11}**     Plaintiff's argument is primarily based on her view that SCC is an agent of the City and that, as an agent, SCC stands in the shoes of the City for purposes of IPRA.  Plaintiff discusses general agency principles but provides no support for the assertion that IPRA's access provision explicitly reaches private entities such as SCC.  The City, on the other hand, contends that because the operating agreement identified SCC as an independent contractor and because the City did not specifically require SCC to record the City meetings, neither the City nor SCC was subject to IPRA.  The City cites no authority for its position nor does it explain why the distinction of SCC's designation as an independent contractor in this case has any bearing on our analysis.  As a general rule, this Court will not consider propositions that are unsupported by citation to authority.  *ITT Educ. Servs., Inc. v. Taxation & Revenue Dep't*, 1998-NMCA-078, ¶ 10, 125 N.M. 244, 959 P.2d 969.  Because the parties' arguments are not helpful and because this is a matter of first impression, we look to other jurisdictions that have squarely faced this issue for guidance.  We begin with FOG's invitation to consider the decisions of the Florida courts.

**{12}**     Florida appellate courts have repeatedly held that documents in the control of a government contractor are public records subject to inspection.  Importantly, Florida's public records law, like New Mexico's, states that every person has the right to inspect or copy any public record including those records "made or received in connection with the official business of any public body, officer, or employee of the state, *or persons acting on their behalf*[.]"  Fla. Const. art. I § 24(a) (emphasis added).  The Florida Public Records Act defines "public records" as including any document or sound recording made or received "by any agency."  Fla. Stat. Ann. § 119.011(12) (West 2008).  The Florida legislature further defined "[a]gency" to include not only governmental units, but any "business entity acting on behalf of any public agency."  Fla. Stat. Ann. § 119.011(2).

**{13}**     The seminal Florida case addressing when a private entity will be subject to its state public records law is *News & Sun-Sentinel Co. v. Schwab, Twitty & Hanser Architectural Gr., Inc.*, 596 So. 2d 1029 (Fla. 1992).  There, the Florida Supreme Court listed nine factors that can be used to determine whether a private corporation is "acting on behalf of any public agency" under the public records law.  *Id.* at 1031.  Those factors include:

> 1) the level of public funding; 2) commingling of funds; 3) whether the activity was conducted on publicly owned property; 4) whether the services contracted for are an integral part of the public agency's chosen decision-making process; 5) whether the private entity is performing a governmental function or a function which the public agency otherwise would perform; 6) the extent of the public agency's involvement with, regulation of, or control over the private entity; 7) whether the private entity was created by the public agency; 8) whether the public agency has a substantial financial interest in the private entity; and 9) for who[se] benefit the private entity is functioning.

*Id.*

5

**{14}** Applying this totality of factors test, the court held that an architectural company was not "acting on behalf of any public agency" when it was hired by the county to perform professional architectural services for the construction of a school. *Id.* at 1031-32 (noting that because the firm was not created by the school board, public funds were only given for services rendered, the school board did not control the firm or delegate any of its decision-making process to the firm, and the school board did not perform a government function, the totality of factors test was not met). Nevertheless, the Florida Supreme Court stressed that it was taking a flexible and cautious approach by using a broad definition of "agency" that would ensure that a public agency could not avoid disclosure under Florida law by contractually delegating its responsibility to a private entity. *Id.* at 1031.

**{15}** Since *Schwab*, Florida courts have continued to find that if a private entity is doing more than just providing a specific contracted-for service to the public agency, the private entity is likely to be subject to its access law. For example, in *Mem'l Hosp.-West Volusia, Inc. v. News-Journal Corp.*, 729 So. 2d 373, 379 (Fla. 1999), the Florida Supreme Court held that a lessee running a hospital on behalf of a public authority responsible for public services was a public agency under Florida law. The court agreed with the Florida district court of appeal that the totality of factors test mandated by *Schwab* indicated that when the government transferred the responsibilities of a public health authority to a private entity, the state's sunshine requirements should continue to apply to that entity and that, therefore, open government mandates dictated that reporters must be allowed to attend hospital meetings. *Id.* at 379-82; *see B & S Utils., Inc. v. Baskerville-Donovan, Inc.*, 988 So. 2d 17, 21 (Fla. Dist. Ct. App. 2008) (holding that the fact that the city had delegated its municipal engineering functions to a private entity was dispositive in establishing that documents generated by the private entity were public records); *Dade Aviation Consultants v. Knight Ridder, Inc.*, 800 So. 2d 302, 305-06 (Fla. Dist. Ct. App. 2001) (applying the totality of factors test to determine that the records of a private business venture that was created to perform services under contract with the county in support of a county project were public records).

**{16}** At least four other states have adopted approaches analogous to the totality of factors approach of Florida. The Connecticut Supreme Court in *Connecticut Humane Soc'y v. Freedom of Info. Comm'n*, 591 A.2d 395, 396-97 (Conn. 1991), explained that in order for a private entity to be subject to the state Freedom of Information Act, it must be the "functional equivalent of a public agency." Accordingly, deciding whether an entity is the functional equivalent of a public agency involves considering a number of factors, including whether the entity performs a governmental function, the level of government funding, the extent of government involvement, and whether the entity was created by the government. *Id.* at 397. Although the court stressed that no one factor is determinative, in that case, it found that the Humane Society was not a public agency, in part because there was no government funding. *Id.* at 397-99.

**{17}** In *A.S. Abell Publishing Co. v. Mezzanote*, 464 A.2d 1068 (Md. 1983), the Maryland Court of Appeals held that an insurance guaranty association was an "agency or

6

instrumentality" under the Maryland Public Information Act. *Id.* at 1074. The holding was based on a number of factors, including the interrelationship between the government and private entity, the public purpose of the private entity, the degree of government control, creation of the entity by statute, and the entity's immunity from tort liability. *Id.* at 1073-74

**{18}** Similarly, the North Carolina Court of Appeals has held that a non-profit county hospital system must release terms of legal settlements because of the county commission's control, review, and regulation; public funding; operation on leased property; and operation pursuant to county agreement and bonds. *News & Observer Publ'g Co. v. Wake Cnty. Hosp. Sys., Inc.*, 284 S.E.2d 542, 544-45, 549 (N.C. Ct. App. 1981). The North Carolina court reasoned that corporate entities can be government agencies when they are delegated public functions. *Id.* at 548-49. Like other courts using the totality of factors approach, the North Carolina and Maryland courts considered many aspects of the relationship without making any one factor determinative of public access.

**{19}** Finally, the Oregon Supreme Court in *Marks v. McKenzie High School Fact-Finding Team*, 878 P.2d 417, 419 (Or. 1994), adopted a totality of factors approach when it denied parents access to the records of a fact-finding team appointed by the school district to investigate problems at the local high school. Because the team was independent of the government and not able to make decisions, the court held that the factors weighed against finding it subject to the inspection of public records law. *Id.* at 426.

**{20}** We are persuaded by the application of a totality of factors approach adopted by the courts in Florida and the other states listed above. Further, although no New Mexico case has used the totality of factors test to determine when a private entity should be subject to IPRA's provisions, we find support for utilizing this procedure in our cases that have considered when a private entity performs a public function such that it must comply with statutes generally governing only government agencies. For example, in *Raton Pub. Serv. Co. v. Hobbes*, 76 N.M. 535, 537-38, 417 P.2d 32, 33 (1966), our Supreme Court considered whether a private corporation was "a governing body of a municipality, or a governmental board or commission of a subdivision of the state, supported by public funds" so as to be subject to the then-version of the Open Meetings Act. Because the private corporation operated for the sole benefit of the city, received funding from the city, and utilized city property, the Court held the company must comply with the statute. *Id.* at 537, 540, 417 P.2d at 33, 35. In essence, the Supreme Court in *Raton* considered a number of critical factors to conclude that the private entity was performing a public function of a public agency.

**{21}** In *Mem'l Med. Ctr.*, our Supreme Court was required to identify the standards to be used in determining whether private, non-profit corporations that lease hospitals from a government entity are "political subdivisions" or "local public bodies" for the purposes of the New Mexico Public Works Minimum Wage Act and the Procurement Code. 2000-NMSC-030, ¶¶ 1, 5. Reasoning that whether a private entity must comply with the statutes was a question of legislative intent, the Court concluded that the standard to be applied is

"whether under the totality of the circumstances the government entity is so intertwined with the private entity that the private entity has become an alter ego of the public entity." *Id.* ¶¶ 24, 35. Thus, in evaluating such claims, the Supreme Court instructed that, while courts must examine the legal contract that bind the parties, they are also free to consider other factors such as:

> (a) government involvement in the promotion of the concept of a contract or project; (b) government participation in the funding of the project; (c) financial benefits inuring to a government entity; (d) the public purpose of the project; (e) continuing control over corporate governance, even if it is potential control; (f) continuing control over the current or final disposition of the assets that are or will be the product of the contract or project; (g) commingled public and private financing; (h) whether the activity of the private entity is conducted on publicly owned property; and (i) whether the private entity was created by the public entity.

*Id.* ¶ 35 n.2.

**{22}** The approaches used by our Supreme Court in *Raton* and *Mem'l Med. Ctr.* to determine when a private entity meets the definition of a "political subdivision" or "local body," thereby subjecting it to our statutes, is consistent with the totality of the circumstances test used by Florida and other state courts to determine when private entities are subject to access laws. Consequently, we hold that our courts should consider the types of factors set forth in *Schwab* in deciding whether private entities are subject to IPRA's disclosure requirements. In applying these factors, we reiterate that no one factor is determinative, and all relevant factors need to be analyzed on a case-by-case basis. We emphasize, however, that IPRA should be construed broadly to effectuate its purposes, and courts should avoid narrow definitions that would defeat the intent of the Legislature. *See Cox*, 2010-NMCA-096, ¶ 5 (noting that access to information concerning the affairs of the government is a fundamental and necessary right of every person in this state).

**{23}** Under the standard we have identified, we now consider whether SCC was acting on behalf of the City and is thus subject to IRPA. For the reasons that follow, we conclude that under the totality of the circumstances, the SCC was the functional equivalent of a public agency in this case.

**{24}** The facts establish that in 2008, the City obtained the PEG channel from Baja in order to provide the community with a public access channel. The Ordinance required the City to be responsible for management of the channel and to adopt rules, regulations, and procedures for access channel use. The City then designated and contracted with SCC to manage the PEG channel. Under the operating agreement, SCC agreed to operate the PEG channel "in a manner which is consistent with the principles set forth in the [Ordinance] with the primary purpose being to administer, coordinate, and assist those requesting access on a nondiscriminatory basis." The City funded SCC with an annual grant of $3 per subscriber

8

from the cable company as well as with ninety percent of the franchise fees paid to the City by Baja. There is no evidence that SCC received funding from any other source. The operating agreement also provided that the City would only release these funds to SCC after SCC provided it with an annual activity plan and budget and that SCC could only spend the funds for the scope of services listed in that plan. At the end of each fiscal year, SCC was required to provide an accounting of how the City's funds were spent. Further, "[u]pon reasonable request from [the] City, SCC shall, at any time . . . make available all of its records with respect to all matters covered by this [operating a]greement." The City later leased the basement of the civic center to SCC for $1 per year for SCC's use as a public access television center. Finally, the terms of the operating agreement provided that the City had the right to terminate the contract without cause at which time all funds and property held by SCC would revert to the City.

**{25}** Applying the totality of factors test, we conclude that SCC was acting "on behalf of" the City in this case. All of SCC's funding comes from the City; SCC's operation and activity is conducted on publicly owned property, albeit for a nominal fee; the services provided by SCC are an integral part of the City's decision under the Ordinance to operate a PEG channel; the City is intimately involved in the regulation and procedures for access channel use and has control over SCC to the extent that it can unilaterally cancel the contract; and SCC is operating for the sole benefit of the City. Consequently, once SCC relieved the City of its function to operate the PEG channel and because it uses public equipment and funds to perform that function, the SCC acts "on behalf of" the City and becomes subject to IPRA. Because we hold that SCC was acting on behalf of the City in its role as PEG's operational organization, it follows that the DVD recordings were public records subject to inspection.

**{26}** Again, we reject the assertion by the City and NMML that IPRA does not apply when a public entity contracts out its services to an independent contractor and when nothing in the operating agreement specifically requires the independent contractor to hold records on behalf of the public entity. As the parties and amici point out, public bodies contract with private entities to provide a wide range of services. Today, traditional public functions such as fire protection, transportation, jails, after-school programs, and health care are routinely delegated to private entities—or privatized—for a variety of reasons. To allow such entities to circumvent a citizen's right of access to records by contracting as the City and NMML suggest would thwart the very purpose of IPRA and mark a significant departure from New Mexico's presumption of openness at the heart of our access law. *See Rio Grande Sun v. Jemez Mountains Pub. Sch. Dist.*, 2012-NMCA-___, ¶ 9, ___ P.3d ___ (No. 30,698, Apr. 26, 2012) (stating that "IPRA embodies New Mexico's policy of open government" (internal quotation marks and citation omitted)). We therefore continue to utilize a flexible approach that favors access to records even when held by a private entity.

**IPRA's Remedies**

9

**{27}** "IPRA includes remedies to encourage compliance and facilitate enforcement." *San Juan Agric. Water Users Ass'n*, 2011-NMSC-011, ¶ 12; *see* § 14-2-12. Section 14-2-12(A)(2) provides that an individual whose written request has been denied may bring an enforcement action. "The court shall award damages, costs and reasonable attorneys' fees to any person whose written request has been denied and is successful in a court action to enforce the provisions of [IPRA]." Section 14-2-12(D); *see San Juan Agric. Water Users Ass'n*, 2011-NMSC-011, ¶ 13.

**{28}** Plaintiff has prevailed in her action here. The district court found that at the time of Plaintiff's request, one recording was still held by SCC. The City and SCC denied that the recording existed until trial, by which time it had been erased. There is no evidence that the City or SCC were required to keep the recordings of the City meetings for any time period. However, once Plaintiff filed a written request for the recordings that were kept on the SCC computer, they were public records subject inspection. *See* § 14-2-6(F) (stating that records relating to public business are public records regardless of whether required by law to be kept); *see also* Office of the New Mexico Attorney General, *Inspection of Public Records Act Compliance Guide* 28 (6th ed. 2009), available at http://www.nmag.gov/consumer/publications/inspectionofpublicrecordsactcompliancegui de2009. Because Plaintiff succeeded in her appeal and was improperly denied the right to inspect the one recording that remained at the time of her request, we remand to the district court for a determination of the appropriate award under Section 14-2-12(D); *Rio Grande Sun*, 2012-NMCA-___, ¶ 8 (holding that the plaintiff who prevailed in an IPRA enforcement action was entitled to an award of damages, fees, and costs).

## CONCLUSION

**{29}** For the reasons set forth above, we reverse the decision of the district court and hold that the recordings of the City meetings were public records subject to inspection under IPRA. We remand on the limited issue of determining the award of costs and attorney fees to Plaintiff.

**{30}** **IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____
**CELIA FOY CASTILLO, Chief Judge**

_____

**CYNTHIA A. FRY, Judge**

**Topic Index for** *State ex rel. Toomey v. City of Truth or Consequences*, **No. 30,795**

**APPEAL AND ERROR**
Remand
Standard of Review

**GOVERNMENT**
Municipalities
Public Records

**MISCELLANEOUS STATUTES**
Inspection of Public Records Act

**STATUTES**
Interpretation
Rules of Construction