# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2018-NMSC-022

Filing Date: March 5, 2018

Docket No. S-1-SC-35445

STEPHEN PACHECO, in his official capacity as
Custodian of Records for the First Judicial District Court,
and the FIRST JUDICIAL DISTRICT COURT OF
NEW MEXICO,

      Petitioners,

v.

HON. JAMES M. HUDSON,
Fifth Judicial District Court Judge,

      Respondent,

and

VALLEY MEAT COMPANY, LLC, and
RICARDO DE LOS SANTOS,

      Real Parties in Interest.

ORIGINAL PROCEEDING

Fuqua Law & Policy, P.C.
Scott Fuqua
Santa Fe, NM

for Petitioners

Hector H. Balderas, Attorney General
James C. Jacobsen, Assistant Attorney General
Santa Fe, NM

for Respondent

1

Western Agriculture, Resource and Business Advocates, LLP
A. Blair Dunn
Albuquerque, NM

L. Helen Bennett, P.C.
Linda Helen Bennett
Albuquerque, NM

for Real Parties in Interest

**OPINION**

**DANIELS, Justice.**

**{1}**    New Mexico's Inspection of Public Records Act, NMSA 1978, §§ 14-2-1 to -12 (1947, as amended through 2013) (IPRA), was enacted to provide the public with broad access to public records reflecting "the affairs of government and the official acts of public officers and employees." Section 14-2-5.

**{2}**    In this superintending control proceeding arising from an IPRA action filed in one district court seeking an order for disclosure of records directed to another district court, we clarify the constitutional and statutory procedures for IPRA enforcement actions to compel production of court records, and we hold that IPRA actions directed at a district court's records must be filed against the lawfully designated IPRA custodian and must be filed in the judicial district that maintains the records.

**{3}**    We also hold that (1) contents of an officeholder's personal election campaign social media website and (2) internal decision-making communications that are at the core of the constitutional duties of the judicial branch, such as preliminary drafts of judicial decisions, are not public records that are subject to mandatory disclosure and inspection under IPRA.

**I.    BACKGROUND**

**{4}**    Although the issues in this superintending control proceeding relate to the interpretation of the scope of IPRA, the controversy arose from a civil case in the First Judicial District Court, *State ex rel. King v. Valley Meat Co., LLC*, No. D-101-CV-2013-3197 (Valley Meat case). Because of the multiplicity of actions in three different courts that we must address, we will refer to the various parties by name rather than their party designation in any of the separate suits.

**{5}**    On Saturday, January 18, 2014, early in the proceedings in the Valley Meat case, A. Blair Dunn, counsel for Valley Meat Co., e-mailed an IPRA request to First Judicial District Court Executive Officer Stephen Pacheco for production of, among other things, communications and records relating to the Valley Meat case, including "all communications

2

between . . . Judge Matthew Wilson and his staff . . . and Court Clerk's staff" and "[a]ny communications received by Judge Matthew Wilson and his staff, Judge Raymond Ortiz and his staff, and any member of the Court Clerk's staff to/from any outside person or organization."

**{6}** On the same date, Mr. Dunn also e-mailed a separate IPRA request to First Judicial District Judge Matthew Wilson, the assigned judge in the Valley Meat case, to not only provide the same records requested from Mr. Pacheco but additionally to produce information relating to the "Keep Judge Matthew Wilson Facebook page" on an Internet social media website maintained by Judge Wilson's personal election campaign. In particular, the IPRA request sought production of communications posted by members of the public on Judge Wilson's personal election campaign Facebook page, including a copy of the Facebook page, a list of people who had clicked a button to indicate they "Liked" the Facebook page, copies of all private Facebook messages to or from Judge Wilson, copies of the "permissions settings" for the Facebook page, and copies of any posts by the page administrators or by members of the public, including any deleted posts.

**{7}** On February 3, Mr. Pacheco responded to both IPRA requests, advising Mr. Dunn that as executive officer of the First Judicial District Court he, and not Judge Wilson, was the district court's custodian of records designated to receive and respond to IPRA requests. *See* § 14-2-7 (providing that each public body shall designate at least one custodian of public records to receive and respond to IPRA requests).

**{8}** Mr. Pacheco's response individually addressed each of Mr. Dunn's requests and stated that the court was producing all pertinent and producible public records that had been located by both electronic and manual searches. The response noted that the court was not in a position to produce items related to Judge Wilson's personal election campaign Facebook page, none of which were "used, created, received, maintained or held by or on behalf of the First Judicial District Court." The response also advised that privileged communications that "are exempt from disclosure under IPRA" would not be produced.

**{9}** On February 24, Mr. Dunn filed an IPRA enforcement lawsuit in the Fifth Judicial District Court on behalf of Valley Meat Co. and its manager Ricardo De Los Santos (collectively Valley Meat), naming as defendants Judge Wilson and the First Judicial District Court but not Mr. Pacheco. The lawsuit, assigned to Fifth Judicial District Judge James M. Hudson, alleged that "Defendants have violated the New Mexico Inspection of Public Records Act by failing to produce the public records properly requested by the Plaintiffs as required by the IPRA" and sought injunctive relief, damages, and attorney fees.

**{10}** On March 17, the office of the Attorney General answered the complaint on behalf of the judicial defendants, Judge Wilson and the First Judicial District Court. On April 11, the Attorney General's office filed a motion for summary judgment with supporting affidavits, asserting that all known unprivileged IPRA public records had been disclosed. The motion noted that the disclosed records included thirteen pages of e-mails that had

3

already been known to Mr. Dunn before he filed his IPRA request but that had not been located in the court computer system until after the IPRA lawsuit was filed.

**{11}** With respect to those late-disclosed e-mails, the motion for summary judgment and supporting affidavits reported the process that led to their belated production. To locate the requested categories of e-mails, First Judicial District Court personnel sought assistance from the Administrative Office of the Courts' Judicial Information Division (JID), which maintains and oversees the state judiciary's computer systems. JID personnel conducted four server searches between January 22 and 30 for e-mails responsive to Mr. Dunn's requests but did not find those particular e-mails.

**{12}** After Mr. Pacheco provided the initial February 3 IPRA response, district court staff learned that Mr. Dunn claimed to be in possession of a number of Judge Wilson's e-mails that would have been covered by Mr. Dunn's IPRA request but that had not been disclosed in the February 3 response. Court personnel then conducted several additional e-mail searches, finding in Judge Wilson's alternative court e-mail account, dedicated to communicating proposed text for court documents among parties and the court, thirteen additional pages of emails related to the Valley Meat case that had been received by, sent by, or copied to Judge Wilson's chambers. Although Mr. Dunn had been a party to all those e-mails when they were first transmitted, Mr. Pacheco formally reprovided copies of these additional emails to Mr. Dunn in a March 17 supplemental IPRA response.

**{13}** Before ruling on the motion for summary judgment, Judge Hudson had examined in camera five e-mail files that the First Judicial District Court had withheld from the February 3 production on grounds of privilege and concluded that four of the five constituted communications between Judge Wilson and his staff or the court's staff attorney that were protected from disclosure by a constitutional judicial deliberation privilege. As Judge Hudson noted in his written decision, Valley Meat conceded those four privileged communications were exempt from disclosure.

**{14}** Judge Hudson also ruled that the judicial deliberation privilege did not apply to the fifth e-mail exchange in which Judge Wilson had requested assistance in proofreading an unfiled draft order in the Valley Meat case from Stephanie Wilson, who was an employee of the Supreme Court Law Library and the spouse of Judge Wilson. Judge Hudson ruled that the judicial deliberation privilege did not protect that e-mail exchange because Stephanie Wilson was neither a member nor an "essential extension[] of" Judge Wilson's First Judicial District Court staff.

**{15}** With regard to the Facebook requests, Judge Hudson concluded that Judge Wilson had not been acting in any official judicial capacity in establishing or maintaining his election campaign Facebook page and concluded that the Facebook contents were not public records of the First Judicial District Court and consequently were not governed by IPRA.

**{16}** Judge Hudson also addressed the thirteen pages of e-mails that had been located and

4

produced before his ruling but after the IPRA lawsuit was filed. Although Mr. Dunn had been a party to or had been copied on each of those e-mails at the times of their original transmissions, and therefore already possessed them when the First Judicial District Court provided its timely February 3 initial IPRA response, Judge Hudson noted that IPRA requires production of public records without regard to whether the requestor already has the records. He concluded that although those emails had been produced by the time of his ruling, the failure to locate and produce them within the fifteen-day IPRA production period constituted an unlawful failure to produce.

{17}    Based on these rulings, Judge Hudson granted partial summary judgment in favor of the judicial defendants on all issues except the undisclosed e-mail exchange between Judge Wilson and Supreme Court Law Librarian Stephanie Wilson regarding the request to proofread a preliminary draft of an order in the underlying lawsuit and the thirteen pages of e-mails disclosed after commencement of the IPRA enforcement action. As to those matters, he ruled that Valley Meat would be entitled to recovery of costs and attorney fees under Section 14-2-12(D) as a prevailing party in the enforcement lawsuit.

{18}    Following entry of the partial summary judgment, the First Judicial District Court filed a petition for a writ of superintending control in this Court to have us consider issues of judicial immunity and the scope of IPRA.

{19}    After initial briefing and oral argument we remanded the matter to the Fifth Judicial District Court with instructions that Judge Hudson complete the adjudication of all issues outstanding in the case before we entered a final disposition in the superintending control case before us. We also directed Judge Hudson to dismiss Judge Wilson as a named defendant in the IPRA action and to substitute Stephen Pacheco, the lawfully designated IPRA custodian of public records for the First Judicial District Court.

{20}    On remand, Judge Hudson ordered that records custodian Stephen Pacheco be substituted for Judge Wilson as a defendant and, assisted by stipulations of the parties, issued a final judgment essentially confirming his earlier rulings. He concluded that Pacheco and the First Judicial District Court were liable for Valley Meat's attorney fees and costs related to the enforcement action for the late-produced e-mails and the e-mail exchange between Judge Wilson and Supreme Court Law Librarian Stephanie Wilson regarding the draft judicial order. But Judge Hudson did not make an assessment of costs and fees, believing he did not have the constitutional authority to order their payment by the terms of Article VI, Section 13 of the New Mexico Constitution, which prohibits a district court from issuing orders "directed to judges or courts of equal or superior jurisdiction."

{21}    Following the issuance of the final judgment in the district court, the matter came back before this Court for final resolution of the writ of superintending control.

## II.    DISCUSSION

**{22}** This Court has long recognized and enforced the important goals served by IPRA. *See San Juan Agric. Water Users Ass'n v. KNME-TV*, 2011-NMSC-011, ¶ 16, 150 N.M. 64, 257 P.3d 884 ("In order for government to truly be of the people and by the people, and not just for the people, our citizens must be able to know what their own public servants are doing in their name."); *State ex rel. Newsome v. Alarid*, 1977-NMSC-076, ¶ 34, 90 N.M. 790, 568 P.2d 1236 ("The citizen's right to know is the rule and secrecy is the exception. Where there is no contrary statute or countervailing public policy, the right to inspect public records must be freely allowed."), *superseded by statute on other grounds*, *Republican Party of N.M. v. N.M. Taxation & Revenue Dep't*, 2012-NMSC-026, ¶¶ 15-16, 283 P.3d 853.

**{23}** We are guided by the Legislature's clear statement of its purpose in enacting IPRA:

**14-2-5. Purpose of act; declaration of public policy.**

> Recognizing that a representative government is dependent upon an informed electorate, the intent of the legislature in enacting the Inspection of Public Records Act is to ensure, and it is declared to be the public policy of this state, that all persons are entitled to the greatest possible information regarding the affairs of government and the official acts of public officers and employees. It is the further intent of the legislature, and it is declared to be the public policy of this state, that to provide persons with such information is an essential function of a representative government and an integral part of the routine duties of public officers and employees.

Section 14-2-5.

**{24}** Because the parties below stipulated to the relevant facts, we are presented with issues of pure statutory and constitutional construction. Our review of a lower tribunal's interpretation of statutory or constitutional law is de novo. *State Eng'r of N.M. v. Diamond K Bar Ranch, LLC*, 2016-NMSC-036, ¶ 12, 385 P.3d 626. "A statute must be interpreted and applied in harmony with constitutionally imposed limitations." *El Castillo Ret. Residences v. Martinez*, 2017-NMSC-026, ¶ 25, 401 P.3d 751. We also review de novo a district court's construction of the law relating to privileges. *Estate of Romero ex rel. Romero v. City of Santa Fe*, 2006-NMSC-028, ¶ 6, 139 N.M. 671, 137 P.3d 611. Whether specific communications are subject to IPRA is a mixed question of fact and law that we review de novo. *Dominguez v. State*, 2015-NMSC-014, ¶ 9, 348 P.3d 183.

**{25}** Our primary goal in interpreting statutory language is to "give effect to the intent of the Legislature." *State v. Smith*, 2004-NMSC-032, ¶ 8, 136 N.M. 372, 98 P.3d 1022 (internal quotation marks and citation omitted). "We look first to the plain meaning of the statute's words, and we construe the provisions of the Act together to produce a harmonious whole." *Dewitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 14, 146 N.M. 453, 212 P.3d 341 (internal quotation marks and citation omitted).

6

**{26}** With those guiding principles in mind, we now consider the applicability of IPRA to the production requested in this case.

**A.** **Contents of an Officeholder's Election Campaign Social Media Website Are Not Public Records of a Public Body Within the Scope of IPRA**

**{27}** IPRA textually makes clear that it is aimed at "the affairs of government" and the "official" acts of public officers and employees. Section 14-2-5. Section 14-2-6(F) defines "public body" as

> the executive, legislative and judicial branches of state and local governments and all advisory boards, commissions, committees, agencies or entities created by the constitution or any branch of government that receives any public funding, including political subdivisions, special taxing districts, school districts and institutions of higher education.

Section 14-2-6(G) defines "public records" as

> all documents, papers, letters, books, maps, tapes, photographs, recordings and other materials, regardless of physical form or characteristics, that are used, created, received, maintained or held by or on behalf of any public body and relate to public business, whether or not the records are required by law to be created or maintained.

**{28}** Judge Hudson found that Judge Wilson did not act in an official capacity in establishing or maintaining his personal election campaign Facebook page and that Judge Wilson did not use the Facebook page "to conduct judicial business" or "perform[] . . . public functions." Judge Hudson also concluded that the Facebook page itself did not meet the definition of "public body" for purposes of Section 14-2-6(F) because it "was not created by the [C]onstitution or judicial branch. Nor is there any indication it received any public funding. Therefore, the Facebook page is not a public body or extension of a public body."

**{29}** We recognize that it is possible for a public body to involve a private entity in conducting governmental business and subject the otherwise private entity's records relating to that governmental activity to IPRA requirements. New Mexico precedent applies nine nonexclusive factors in a totality-of-factors test to determine whether a private entity has acquired such a role:

> 1) the level of public funding; 2) commingling of funds; 3) whether the activity was conducted on publicly owned property; 4) whether the services contracted for are an integral part of the public agency's chosen decision-making process; 5) whether the private entity is performing a governmental function or a function which the public agency otherwise would perform; 6) the extent of the public agency's involvement with, regulation of, or control

7

over the private entity; 7) whether the private entity was created by the public agency; 8) whether the public agency has a substantial financial interest in the private entity; and 9) for who[se] benefit the private entity is functioning.

*State ex rel. Toomey v. City of Truth or Consequences*, 2012-NMCA-104, ¶ 13, 287 P.3d 364 (alteration in original).

**{30}**    In *Toomey*, a city obtained a public access television channel and retained authority to manage the channel and to adopt rules, regulations, and procedures pursuant to that authority. *Id.* ¶ 24. The city then contracted with a private nonprofit corporation to manage the channel. *Id.* ¶¶ 1, 11, 24. The city leased public property to the corporation for one dollar per year for use as a public access television center. *Id.* ¶ 24. As the exclusive source of funding for the nonprofit corporation, the city previewed the corporation's operating budgets and oversaw its accounting. *Id.* The *Toomey* court applied the nine factors to determine that although the channel was a private entity, to the extent that it was acting on behalf of the city its records became subject to IPRA disclosure requirements. *Id.* ¶ 25.

**{31}**    None of the *Toomey* factors were found by Judge Hudson to be present in this case. Judge Hudson specifically wrote that "[t]here is no basis to conclude that Judge Wilson was acting in any official judicial capacity in establishing or maintaining the Facebook page, that the Facebook page was used to conduct judicial business, or that there is any nexus between Judge Wilson's judicial conduct and his personal campaign activities."

**{32}**    We have identified nothing in the record to contradict Judge Hudson's findings. There is no evidence that Judge Wilson's personal election campaign or its Facebook site were acting on behalf of the First Judicial District Court or any other public body, or that any government funding was involved in maintenance of the Facebook site or any of its activities, or that Judge Wilson conducted public business through the site. Both the wording of IPRA and the *Toomey* factors weigh against subjecting Judge Wilson's Facebook page to the public record requirements of IPRA.

**{33}**    Even though there was no evidence Judge Wilson communicated anything about the Valley Meat case on his election campaign site, Valley Meat argues in effect that members of the public caused the contents of the election campaign site to become public records of a public body when they posted several unsolicited extrajudicial comments about the Valley Meat case that was pending before Judge Wilson. These comments urged him to stop the slaughter of horses for use as food and praised his rulings in the case. None of those comments by third parties satisfy any of the *Toomey* factors. It would blur any standards imposed by IPRA if we were to hold that third-party comments about an officeholder's performance of the officeholder's official duties that are communicated through social media, news outlets, online discussion sites, or other nongovernmental entities would transform those entities into public bodies and subject their records to IPRA disclosure and inspection obligations.

**{34}** To the extent Valley Meat expresses a concern about the need to discover whether judges are engaged in inappropriate unofficial communications, it confuses the public records focus of IPRA with discovery procedures that may be employed for production of communications outside the public record, whether in litigation or in judicial discipline actions. This Court is sensitive to concerns about the pitfalls judges may encounter when using social media. *See State v. Thomas*, 2016-NMSC-024, ¶ 49, 376 P.3d 184 ("While we make no bright-line ban prohibiting judicial use of social media, we caution that 'friending,' online postings, and other activity can easily be misconstrued and create an appearance of impropriety."); New Mexico Code of Judicial Conduct, Rule 21-001(B) NMRA ("Judges and judicial candidates are also encouraged to pay extra attention to issues surrounding emerging technology, including those regarding social media, and are urged to exercise extreme caution in its use so as not to violate the Code.").

**{35}** While we recognize that the use of social media is widespread in modern election campaigns for candidates seeking offices in all three branches of government, we caution that social media can pose particular risks of an appearance of impropriety on the part of judges who must participate in political elections. *See* Rule 21-001(B) (requiring judges to "avoid both impropriety and the appearance of impropriety"). This case is a good example. Even though there was no evidence Judge Wilson used his election campaign website to communicate to anyone about the case before him, the site did not block third persons from posting whatever they chose on his site, such as their comments about the Valley Meat case. Those third parties certainly had a First Amendment right to express their opinions about the acts of Judge Wilson or any other government official, just as they could write letters to a newspaper or picket the courthouse or other government building. But their right to free expression did not require that his campaign permit their postings on a site maintained in the Judge's name.

**{36}** Even if a judge engages in misconduct with respect to off-the-bench election campaign activities, which is not present in this case, that would not be decisive in determining whether records are subject to IPRA. If a judge or any other public employee has engaged in misconduct beyond the performance of official activities, the fact that evidence of the misconduct may be found outside public records does not transform that evidence into a public record maintained by a public body. We agree with Judge Hudson that in the circumstances presented in this record, the contents of Judge Wilson's personal election campaign Facebook page were not public records of a public body subject to IPRA disclosure requirements.

**B.** **The Judicial Deliberation Privilege Protects the Confidentiality of Draft Judicial Orders and Other Internal Judicial Decision-Making Processes**

**{37}** Five of Judge Wilson's e-mail communications had been withheld from IPRA production by Mr. Pacheco on the ground of privilege. All five related to reviewing a draft copy of a preliminary injunction order that Judge Wilson had been preparing for issuance in the underlying Valley Meat case. Four of those e-mails were communications between

9

Judge Wilson and staff employed directly by the First Judicial District Court. The fifth was a communication between Judge Wilson and Stephanie Wilson, the wife of Judge Wilson, who was employed by the judicial branch as a Supreme Court law librarian and who had been asked by Judge Wilson to assist in proofreading the draft order.

**{38}**   IPRA explicitly recognizes that there are some categories of public records that should be protected from disclosure. In Section 14-2-1, after the broad policy statement that "[e]very person has a right to inspect public records of this state," IPRA specifically lists a number of documents where policy considerations in confidentiality override public disclosure, including physical and mental health records, reference letters, opinions about students or employees, confidential law enforcement records, materials donated to schools under confidentiality limitations, trade secrets, attorney-client communications, confidential business plans of hospitals, and terrorist attack defense plans. Section 14-2-1(A)(1)-(7).

**{39}**   The statutory exceptions conclude with the addition of a catch-all category, "as otherwise provided by law." Section 14-2-1(A)(8). As New Mexico precedent recognizes, that term includes "statutory and regulatory bars to disclosure," "constitutionally mandated privileges," and "privileges established by our rules of evidence." *Republican Party*, 2012-NMSC-026, ¶ 13.

**{40}**   We have previously expressed our sensitivity to the concern that "adopting evidentiary privileges may increase the risk of interfering with the truth-seeking process of litigation." *Albuquerque Rape Crisis Ctr. v. Blackmer*, 2005-NMSC-032, ¶ 18, 138 N.M. 398, 120 P.3d 820. Rule 11-501 NMRA limits litigation privileges to those provided in the New Mexico Constitution or the New Mexico Supreme Court rules. *See Estate of Romero*, 2006-NMSC-028, ¶ 11 (declining to recognize a law enforcement or public interest privilege because "[u]nless such privileges are required by the constitution, or provided for in the rules of evidence or other court rules, these privileges do not exist").

**{41}**   We have applied a similar approach to IPRA privileges. In *Republican Party*, 2012-NMSC-026, ¶¶ 33-35, 43, we recognized that the Constitution requires an executive privilege protecting the confidentiality of the Governor's decision-making thought processes in order to protect the full and independent functioning of the executive branch, despite the fact it is not spelled out in a statute or court rule.

**{42}**   In *Republican Party*, we held that an executive privilege protected from IPRA disclosure the confidential communications between the Governor and close advisors "relate[d] to the Governor's constitutionally-mandated duties." *Id.* ¶ 45. We noted that the executive privilege in New Mexico requires a balance between "the public's interest in preserving confidentiality to promote intra-governmental candor [and] the individual's need for disclosure of the particular information sought." *Id.* ¶ 49 (internal quotation marks and citation omitted).

**{43}**   This Court has not previously addressed the need for a judicial deliberation privilege,

but other jurisdictions have done so. *See, e.g.*, *Williams v. Mercer* (*In re Certain Complaints Under Investigation by an Investigating Comm. of Judicial Council of Eleventh Circuit*), 783 F.2d 1488, 1520 (11th Cir. 1986) ("[T]here exists a privilege . . . protecting confidential communications among judges and their staffs in the performance of their judicial duties."), *superseded by statute on other grounds*, *In re McBryde*, 120 F.3d 519, 524 (5th Cir. 1997); *Thomas v. Page*, 837 N.E.2d 483, 490-91 (Ill. App. Ct. 2005) ("Our analysis leads us to conclude that there exists a judicial deliberation privilege protecting confidential communications between judges and between judges and the court's staff made in the course of the performance of their judicial duties and relating to official court business."); *In re Enforcement of a Subpoena*, 972 N.E.2d 1022, 1033 (Mass. 2012) ("This absolute privilege covers a judge's mental impressions and thought processes in reaching a judicial decision, whether harbored internally or memorialized in other nonpublic materials. The privilege also protects confidential communications among judges and between judges and court staff made in the course of and related to their deliberative processes in particular cases.").

**{44}**     We agree that we should "join other courts, State and Federal, that, when faced with attempts by third parties to extract from judges their deliberative thought processes, have uniformly recognized a judicial deliberation privilege." *In re Enforcement of a Subpoena*, 972 N.E.2d at 1032.

**{45}**     The question that remains for resolution is the scope of the privilege. All parties before us have acknowledged that some form of judicial privilege must protect the judicial decision-making process from mandated IPRA disclosure. Valley Meat concedes in its briefing, for example, that judicial privilege should protect "a judge's case notes, research, mental impressions, analysis, drafts of orders and decisions, or communications between and among judges and their staffs that bear on these categories of documents." Judge Hudson concluded that a judicial deliberation privilege "must, at a minimum, shield from public disclosure a judge's notes, research, mental impressions, analysis, and drafts of orders and decisions."

**{46}**     The issue presented to us for resolution is whether the privilege is circumscribed by organizational charts of employees of particular judicial entities or whether a more functional analysis related to protection of the judicial decision-making process is called for. Judge Hudson concluded, as conceded by Valley Meat, that four of the withheld e-mail communications, those between Judge Wilson and staff of the First Judicial District Court, were protected by the judicial deliberation privilege.

**{47}**     But Judge Hudson held that the e-mail exchange between Judge Wilson and Supreme Court Law Librarian Stephanie Wilson requesting assistance on a draft judicial order fell outside protection of the privilege. Judge Hudson reasoned that because Stephanie Wilson was employed by a separate entity within the judicial branch, the Supreme Court Law Library, instead of directly by the First Judicial District Court, the judicial deliberation privilege protecting a judge's decision-making thought processes did not apply. We disagree. We believe that such a formalistic approach takes too narrow a view of the fundamental

11

purposes underlying the judicial deliberation privilege.

{48}    Valley Meat does not dispute that the e-mail communication between Judge Wilson and Stephanie Wilson related to a request for assistance in proofreading a judicial order Judge Wilson was drafting.[1] Valley Meat has taken the position, unsupported by any authority, that our judges must be "relegated to a lonely burden devoid of substantive communications with other district court judges" and their staffs.

{49}    We believe it would be an unreasonable and unprincipled limitation on the full exercise of a judge's research, drafting, and decision-making processes to hold that the confidentiality of that process is forfeited when a judge seeks assistance from judicial branch employees and entities beyond the staff who work directly under the judge or who are named in their individual court organizational charts. A few examples are illustrative.

{50}    All judges in the New Mexico judiciary are provided access to third-party computerized legal research assistance that is essential to the preparation of judicial opinions and orders. Yet despite the fact that compelled production of a judge's research queries and results would disclose the kinds of decision-making processes sought to be protected by the judicial deliberation privilege, those commercial research services appear nowhere in any individual court organizational charts. To hold that research trails reflected in communications between a judge and those services are unprivileged and subject to compelled disclosure would elevate form over substance and be inconsistent with the core purposes of the deliberation privilege.

{51}    All e-mails sought in this case, as with all judicial branch e-mails, were routinely communicated to and stored in the computer servers of JID, a statewide entity operating under the supervision of the Administrative Office of the Courts (AOC). Neither JID nor AOC appear anywhere in the First Judicial District's organizational chart. The organizational chart approach taken by Valley Meat and Judge Hudson would not have protected any of the e-mails in this case from compelled disclosure, including those communications within the First Judicial District that Valley Meat has conceded to be privileged.

{52}    The New Mexico Code of Judicial Conduct recognizes that a judge, in the performance of his or her duties, may consult with court staff, court officials, and other judges, "provided the judge makes reasonable efforts to avoid receiving factual information that is not part of the record and does not abrogate the responsibility personally to decide the matter." Rule 21-209(A)(3) NMRA. But many of our state's district judges have no law

---

[1]Because we resolve this issue on the ground of judicial deliberation privilege, we need not address whether the e-mail was also protected from disclosure by the spousal communication privilege, which protects from compelled disclosure a communication made to a person's spouse that was "not intended for further disclosure except to other persons in furtherance of the purpose of the communication." Rule 11-505 NMRA.

clerks or other personnel to provide expert legal research and editing assistance in their individual courts. In the single-judge Tenth Judicial District, for example, the district judge not only has no law clerks or staff counsel, he has no fellow judge to consult with. It serves no functional purpose to limit a judge's consultation with other judicial branch colleagues to those persons, if any, who happen to be on a particular court's staff.

{53} The New Mexico Supreme Court Law Library, which technically employed Stephanie Wilson, is a separate judicial branch entity that is not placed within the organizational chart of any district court, but its judicial branch staff provides legal information to judges throughout the state's judiciary. As part of their official job requirements, Supreme Court law librarians must, among other duties, (1) "provide for effective access to legal information for the courts, the state and the public," (2) "perform legal research at the most comprehensive level," and (3) "maintain confidentiality and use discretion when dealing with sensitive information." *See* http://humanresources.nmcourts.gov/job-descriptions-salary-tables.aspx (follow Job Classification Descriptions hyperlinks for Law Librarian 1, Law Librarian 2, Law Librarian Senior, and State Law Librarian) (last visited Feb. 26, 2018).

{54} With these considerations in mind, we perceive no principled reason why the judicial deliberation privilege would protect a judge's thought processes that are reflected in a draft order sent to a subordinate for review but would fail to protect the same thought processes reflected in the same draft order when it is submitted to a Supreme Court law librarian or other judicial branch colleague for review. We therefore hold that the communications between Judge Wilson and Supreme Court Law Librarian Stephanie Wilson were exempt from IPRA disclosure by the judicial deliberation privilege.

### C.    A District Court Does Not Have Constitutional Jurisdiction to Order IPRA Relief or Sanctions Against Another District Court

{55} IPRA specifically requires that each New Mexico public body shall designate at least one custodian of public records who shall be responsible for receiving and responding to IPRA requests. Section 14-2-7. Section 14-2-11(C)(4) provides that "[a] custodian who does not" timely respond to an IPRA request "is subject to an action to enforce the provisions of the Inspection of Public Records Act and the requester may be awarded damages," which shall "be payable from the funds of the public body." Section 14-2-12(A) provides that the enforcement action may be brought by the attorney general, a district attorney "in the county of jurisdiction," or "a person whose written request has been denied." And Section 14-2-12(B) provides that "[a] district court may issue a writ of mandamus or order an injunction or other appropriate remedy to enforce the provisions of" IPRA.

{56} Instead of filing its IPRA enforcement action, seeking what it claimed to be public records of the First Judicial District Court, against the lawfully designated records custodian, First Judicial District Court Executive Officer Stephen Pacheco, Valley Meat filed its IPRA action against the court and Judge Wilson as named defendants. And instead of filing the

13

action in the First Judicial District Court, Valley Meat filed in the Fifth Judicial District Court. Those filing decisions raise two issues: (1) who is the proper defendant in an IPRA enforcement action, and (2) which "district court may issue a writ of mandamus or order an injunction or other appropriate remedy to enforce" IPRA requirements pursuant to Section 14-2-12(B)?

**{57}** The first question is clearly answered in the text of IPRA itself. The designated records custodian is the only official who is assigned IPRA compliance duties, *see* § 14-2-7, and is the only official who statutorily "is subject to an action to enforce" IPRA, *see* § 14-2-11(C). In our thirteen New Mexico judicial districts, the designated custodians are the district court executive officers, who have overall responsibility to oversee the administration of their respective courts and fulfill statutory responsibilities assigned to the clerk of the court. *See* http://humanresources.nmcourts.gov/job-descriptions-salary-tables.aspx (follow Job Classification Descriptions hyperlinks for Court Executive Officer descriptions) (last visited Feb. 26, 2018).

**{58}** The second question is not directly addressed in the IPRA statute, but is governed instead by the New Mexico Constitution. Section 14-2-12 provides only that "[a] district court may issue a writ of mandamus" or other enforcement action to compel compliance but does not directly answer the question of which district court may issue the enforcement orders. For actions directed at custodians of records for a district court, the answer lies in the New Mexico Constitution.

**{59}** Article VI, Section 13 of the New Mexico Constitution provides the jurisdictional authority of our district courts. In relevant part, it specifies,

> The district courts, or any judge thereof, shall have power to issue writs of habeas corpus, mandamus, injunction, quo warranto, certiorari, prohibition and all other writs, remedial or otherwise in the exercise of their jurisdiction; provided, that no such writs shall issue directed to judges or courts of equal or superior jurisdiction.

*Id.*

**{60}** Even if IPRA had purported to permit one district court to order a separate district court to comply with statutory production requirements, which it did not, a statutory provision, such as IPRA or a general venue statute like NMSA 1978, Section 38-3-1 (1988) (permitting suit in a county where a party resides), cannot override a constitutional prohibition. *See State v. Nunez*, 2000-NMSC-013, ¶ 47, 129 N.M. 63, 2 P.3d 264 (holding that a legislative enactment cannot transgress a constitutional limitation).

**{61}** New Mexico precedent recognizes that a lawsuit against a court employee, such as a designated records custodian, in his or her official capacity is a suit against the court itself. *Williams v. Bd. of Cty. Comm'rs of San Juan Cty.*, 1998-NMCA-090, ¶ 15, 125 N.M. 445,

14

963 P.2d 522 (holding that sovereign immunity barred suit against Navajo police officers and the Navajo Nation's president in their official capacities (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.")); *Ford v. N.M. Dep't of Pub. Safety*, 1994-NMCA-154, ¶ 16, 119 N.M. 405, 891 P.2d 546 (recognizing that "a suit for damages against a state official in his or her official capacity is essentially a suit for damages against the state itself").

**{62}** New Mexico's case law is consistent with law in other jurisdictions. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State."); *Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011) ("[A] claim asserted against a government official in his official capacity is essentially a claim against the governmental entity itself."); *Briscoe v. United States*, 268 F. Supp.3d 1, 9 (D.D.C. 2017) ("'[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity' of which the named officer is an agent." (citation omitted)); *Wright v. Cleburne Cty. Hosp. Bd., Inc.*, ___ So. 3d ___, 2017 WL 6629201 at *6 (Ala. 2017) ("If a plaintiff chooses to sue [a government] official or employee in [the official's or employee's] official capacity, such a claim is treated as a claim against the 'governmental entity' because it constitutes an attempt to reach the public coffers." (citation omitted)).

**{63}** Judge Hudson and the parties have at least in part recognized the constitutional prohibition against seeking to have one district court order relief from another district court. Judge Hudson concluded that he could not order payment of fees and costs of the IPRA enforcement suit against the First Judicial District Court and its records custodian because of his court's lack of constitutional jurisdiction. Valley Meat concedes that Judge Hudson was correct in that conclusion and suggests in its briefing that we should accept his findings and conclusions directed at the First Judicial District Court and order that court to pay fees and costs in the exercise of our own original jurisdiction.

**{64}** But both Judge Hudson and Valley Meat ignore the larger implications of Article VI, Section 13's denial of district court jurisdiction. The entirety of an IPRA enforcement action brought in one district court against another district court is barred by the New Mexico Constitution. Any IPRA enforcement action is an action to compel performance by the named defendant, as Section 14-2-12(B) recognizes: "A district court may issue a writ of mandamus or order an injunction or other appropriate remedy to enforce the provisions of [IPRA]."

**{65}** Instead of captioning its lawsuit to compel compliance with IPRA as a mandamus or a suit for injunctive relief, Valley Meat called it a "Verified Complaint for Declaratory Judgment Ordering Production." Apart from the facts that the lawsuit was clearly a suit for a coercive "judgment ordering production" under IPRA and that Valley Meat was not attempting to seek noncoercive relief under the Declaratory Judgment Act, NMSA 1978, §§ 44-6-1 to -15 (1975), it could not have done so because an IPRA enforcement action is

15

governed by IPRA. *See State ex rel. Regents of E.N.M. Univ. v. Baca*, 2008-NMSC-047, ¶ 22, 144 N.M. 530, 189 P.3d 663 (holding that a party with a statutory right to judicial review must not "circumvent the established procedures for judicial review" under the statute).

**{66}** We conclude that the Fifth Judicial District Court had no constitutional jurisdiction to litigate any aspect of an IPRA enforcement action against the First Judicial District Court. To the extent that Valley Meat or any litigant harbors a concern that the judges of a district court would not fairly and impartially rule in an IPRA enforcement action against its own records custodian, the judicial branch has procedures in place to safeguard against both the reality and the appearance of impropriety in such situations.

**{67}** Article VI, Section 15 of the New Mexico Constitution vests the Chief Justice of this Court with the authority to designate an active or retired judge to hold court in any judicial district in cases of disqualification or other unavailability on the part of active judges in the district, an authority that is routinely exercised in suits involving an employee of the district court as a party.

**{68}** Pursuant to that authority, for example, this Court maintains standing orders to designate outside judges to preside over cases in which a judge or employee of a district court is a party. When the IPRA action against the First Judicial District Court was filed in the Fifth Judicial District, for example, a judge from either the Fourth or Seventh Judicial District was required to be designated as a First Judicial District judge to hear such cases. New Mexico Supreme Court order, February 12, 2014 (No. 14-8500). This mechanism complies with the constitutional prohibition against district courts issuing orders to other district courts, permits full enforcement of IPRA, and avoids the appearance of judicial bias.

**{69}** In this case, because the Fifth Judicial District Court had no constitutional jurisdiction to adjudicate any part of the IPRA enforcement action against the records custodian of the First Judicial District, including both the adjudication of IPRA violations and the assessment of resulting fees and costs, we enter a writ of superintending control directing Judge Hudson to dismiss the IPRA proceeding in its entirety. And because we have determined that there is no IPRA dispute remaining to be resolved by any court as a result of Valley Meat's having received all IPRA production to which it was entitled, there is no further enforcement action regarding the records requests in this matter that can now be taken in the First Judicial District Court.

## III.    CONCLUSION

**{70}** For the reasons stated herein, a writ of superintending control will issue directing Respondent James M. Hudson to vacate the previously entered summary judgment and to dismiss for lack of jurisdiction the complaint in *Valley Meat Co., LLC v. Pacheco*, D-504-CV-2014-86.

**{71}    IT IS SO ORDERED.**

16

_____
**CHARLES W. DANIELS, Justice**

**WE CONCUR:**

_____
**JUDITH K. NAKAMURA, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**BARBARA J. VIGIL, Justice**